Filed 9/22/20

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C079709 |
| Plaintiff and Respondent, | (Super. Ct. No. SF120774A) |
| v. | |
| YOR XIONG, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, Bernard Garber, Judge. Affirmed as modified.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, John A. Bachman, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts III through VII of the Discussion.

1

Defendant Yor Xiong shot the victim multiple times and then led police on a high-speed car chase on surface streets from south to north Stockton ending across the street from his house. A jury found defendant guilty of murder in the first degree (count 1), possession of a firearm by a felon (count 2), and evading an officer with wanton disregard (felony evading) (count 3). The jury also found true an enhancement allegation in connection with count 1 that defendant personally discharged a firearm causing the victim's death. The jury deadlocked on gang enhancement allegations on counts 1 and 2, and thereafter, the trial court granted the prosecution's motion to strike those allegations. Defendant was sentenced to 50 years to life plus two years eight months.

On appeal, defendant asserts that the trial court prejudicially erred in: (1) prohibiting him from testifying about his understanding, based on his experiences in Thai refugee camps, of a person's ability to deny allegations made by camp police officers, such testimony having been offered to establish that he made a false confession to the police in the instant case; (2) instructing the jury, in its CALCRIM No. 358 instruction, that the jury should consider with caution defendant's *unrecorded* statements because his defense was based on the premise that his *recorded* statements were coerced, false, and not credible and the instruction undercut this defense by suggesting the recorded statements should not be considered with caution; (3) refusing to hold an Evidence Code section 402 hearing regarding the testimony of the prosecution's gang expert; and (4) allowing the gang expert to testify concerning defendant's booking statements about his gang affiliation in violation of *People v. Elizalde* (2015) 61 Cal.4th 523 (*Elizalde*). Defendant also requests (5) that this court review the sealed transcripts of the in camera *Pitchess*[1] hearing to determine if the trial court followed proper procedure and released all relevant material. In supplemental briefing, defendant asserts (6) that, following the

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

enactment of Senate Bill No. 620, his case must be remanded for the trial court to consider whether to exercise its discretion to strike the firearm enhancement, and (7) that, following the enactment of Senate Bill No. 136, his two one-year prior prison term enhancements must be struck.

In the published portion of this opinion, we conclude that the trial court erred in precluding defendant's testimony regarding his understanding about what happened to people who denied allegations made by police in the Thai refugee camps where he was born and stayed as a boy. His cultural experience was relevant to his state of mind in interacting with the detectives who interrogated him and tended to prove why he would have given a false confession. However, given the other evidence defendant was allowed to introduce concerning his confession, we conclude that he was not deprived of his constitutional right to present a defense by the preclusion of this testimony. We further conclude that the erroneous preclusion of this testimony was harmless.

We also conclude that the trial court erred in giving the following bracketed sentence from CALCRIM No. 358: "Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded." Defendant did not want the instruction, even though evidence of oral unrecorded inculpatory statements was admitted. The trial court had no sua sponte obligation to give the instruction. It is up to a defendant to request the instruction and a defendant is entitled to reject it. However, under the circumstances here, we conclude the error was harmless.

In the unpublished portion of this opinion, we modify the judgment by striking the two one-year prior prison term enhancements imposed pursuant to Penal Code section 667.5, subdivision (b).[2] We remand so the trial court can exercise its discretion whether

---

[2] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

3

to dismiss or strike the section 12022.53, subdivision (d), firearm enhancement. As for defendant's other contentions, we conclude they are forfeited, meritless, and/or nonprejudicial.

As modified, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charges

Defendant was charged with willful, deliberate, premeditated murder (§ 187, subd. (a); count 1); possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2); felony evasion (Veh. Code, § 2800.2, subd. (a); count 3); and participating in a criminal street gang (§ 186.22, subd. (a); count 4).[3] The information further alleged that defendant committed counts 1 through 3 for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subd. (b)(1).)[4] In connection with the murder count, the information alleged defendant personally used a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), and that defendant personally used a firearm in the commission of a felony. (§ 12022.5, subd. (a).) The information also alleged that defendant had served three prior prison terms within the meaning of section 667.5, subdivision (b).

### The People's Case-in-chief

#### The Shooting

L.C. lived in the vicinity of the shooting. She looked out a window and saw three guys talking across the street. One of them was wearing a red hat. After she closed the

---

[3] Before the commencement of the jury trial, the trial court granted the prosecution's motion to dismiss count 4 based on insufficient evidence.

[4] At the jury instruction conference, the trial court struck the gang enhancement allegation attached to count 3.

4

window, L.C. heard four gunshots and then two more. She saw a small black car speed away on 12th Street towards Airport Way.

N.V. heard what she believed to be fireworks. She then heard someone scream. She looked outside and saw a dark blue or black car, possibly an Acura, parked on the corner of 12th Street and Tiffany Street. She saw a person who looked Hispanic or Asian "looking like that they were looking down at somebody," extending his arm downward. It looked to N.V. like the person was pointing a gun at someone on the ground. N.V. also thought she heard the person "saying like 'F you,' and then . . . like cuz or blood . . . ." N.V. testified that she may have told a detective that the individual said, "Fuck you, cuz, that's for messing with my family" and a detective confirmed that she did. She heard "another bang," and then the person jumped into the driver's side of the car and sped off in the direction of Airport Way. N.V. believed that there was a passenger in the front passenger seat of the vehicle as well.

M.M. heard gunfire and went to the front of her house. She saw a person lying on the ground. She saw another person with a gun in his hand, walking away from the victim to a dark blue car, getting into the driver's seat, and taking off. M.M. described the male with the gun as having light skin and dark hair, wearing shorts and a white T-shirt. She believed he was possibly Asian. The car drove onto 12th Street toward Airport Way.

S.W. and D.C. were at home with D.W. when they heard gunshots. S.W. heard between three and six gunshots. He looked out his window and saw a small dark blue or black car take off westbound on 12th Street towards Airport Way. D.C. and D.W. ran outside. D.C. saw a "guy on the ground just bleeding." Both attempted to keep the person alive until an ambulance arrived.

Officer Edward Webb arrived at the scene at approximately 4:03 p.m. On the way, he received an update of a suspect vehicle, a black Acura. Webb saw a vehicle similar to that description at a red light, headed north on Airport Way at the intersection

5

of Dr. Martin Luther King, Jr., Boulevard. Webb observed the driver of the vehicle. Later, when Webb saw defendant at the hospital, he recognized him as the driver of that vehicle. Webb continued to the scene of the shooting. There, Webb observed the victim on the ground and noted he had been shot several times and a woman was giving him CPR. Police discovered eight cartridge casings at the scene of the shooting.

**The Pursuit, Arrest, and Identification of Defendant**

Officer Jimmy Kwan heard the broadcast concerning the shooting and began to drive toward the area with his lights and siren on. He heard supplementary reports indicating that the persons responsible could be in a dark-colored Honda or Acura. Two to three minutes had elapsed since the initial broadcast, and Kwan was close enough to Tiffany and 12th Streets to believe that the vehicle could be in the area, so he began looking for a vehicle matching the description. Kwan then saw a dark-colored Honda or Acura waiting at the red light on Airport Way at the intersection with Dr. Martin Luther King, Jr., Boulevard. The vehicle proceeded north on Airport Way, and Kwan let it pass. He could see at least two people in the vehicle. Kwan reported the license plate to the dispatcher and he began to follow the vehicle with his lights and siren still on. The vehicle pulled over towards the side of the road, but did not stop. Kwan observed another officer's patrol vehicle with its lights on traveling south on Airport Way make a U-turn and pull behind Kwan's vehicle. The Acura accelerated and the two patrol cars pursued. The Acura was traveling at approximately 50 miles per hour and accelerating, and was not stopping for stop signs or traffic lights. Thereafter, the Acura accelerated to approximately 80 miles per hour, crossed the cement divider, and continued driving north in the southbound lane against oncoming traffic. Kwan testified that the other patrol vehicle lost a tire crossing a center divider. After some time, the Acura crossed back onto the northbound lanes and continued, and subsequently crossed onto the opposite lanes again. The Acura made several turns as Kwan attempted to catch up to it. At some point, Kwan lost sight of the Acura. After several seconds, Kwan reacquired the Acura, and

6

saw that the passenger-side door was open and only one person remained in the car. The Acura continued driving through a residential area at 50 to 60 miles per hour. At some point, the Acura lost a rear tire, and Kwan's patrol vehicle also lost a tire. Realizing that his vehicle was compromised and anticipating the possibility that the Acura and his patrol vehicle could collide with other vehicles or pedestrians, Kwan decided to "use vehicle intervention to stop him." Kwan hit the Acura with his patrol vehicle's bumper a couple of times. The impact caused the Acura to swerve to the right, the vehicles' bumpers became locked together and they eventually came to a stop.

Defendant was apprehended. During the arrest, a canine officer was deployed to help subdue defendant. Defendant suffered a dog bite to the buttocks and other injuries.[5]

Kwan searched defendant and found a glass pipe of the type typically used for smoking methamphetamine. Defendant did not have a gun. Kwan learned that defendant lived across the street and a few houses down from where the pursuit ended.

Police brought M.M. to the location for a showup. M.M. testified she told police that the person was not the person she had seen. According to Officer Mark Sandberg, who transported M.M. to the showup, she thought the person she had seen was lighter skinned and she thought he was wearing a different color shirt, so she was unsure. M.M. testified that she also observed a car nearby, which she told police was not the car because it was not as dark as the car she had seen. However, according to Sandberg, upon observing the vehicle, M.M. said "that was the car."

N.V. was also brought to a location for a showup. She testified that she told police the person they detained was wearing clothes that looked like the person she saw, and that the car looked like the car that had sped away following the shooting. However, N.V. testified that she did not identify the individual because she had not seen what he

_____

[5] We discuss additional circumstances of defendant's arrest in our discussion of his *Pitchess* motion, *post*.

7

looked like. According to Detective Eduardo Rodriguez, N.V. identified defendant as the person she saw earlier and also identified the car as the one she had seen.

### Police Interrogation of Defendant

Detectives Brian Fry and Chuck Harris interrogated defendant following his arrest. The interrogation was recorded and the video was played for the jury.[6] Early in the conversation, Harris asked defendant if he was okay and defendant complained of pain to his buttocks. He remarked that he did not know "why they let the dog bit[e] me." Defendant stated he was not running or resisting. Our review of the video recording reveals that defendant did not appear to have a hard time sitting throughout the interrogation.

Harris explained he wanted to hear defendant's point of view and asked where he was coming from. Defendant said he had been going home from his girlfriend's house near Airport and 10th Streets in the Acura he shared with his brother. Near a park, defendant picked up a male Hispanic acquaintance he only knew as "K" and whom he had only known a week. They had previously smoked crystal together. Defendant said he was on parole,[7] had missed a drug court date and had a warrant out for him, so when police flashed a light on him, he decided not to stop. Believing that he would be arrested anyway, he decided to continue to his house to see his father, who was getting older. He also did not want his brother's car to be towed. At some point, K jumped out of the car and took off. As defendant arrived at his house, the officer chasing him ran his car into defendant's car.

---

[6] The trial court instructed the jury to "accept the video version rather than what's on the transcript because it's subject to typographical error." We have reviewed the recording and we have set forth in this opinion what was said based on our own independent review and not based on the transcript in the record, which was admitted into evidence.

[7] Defendant said he had been on parole for auto theft.

8

When asked by Harris if he had experienced any problems with anyone during the course of the day, defendant stated that he had not. When asked if anyone had a problem with him, defendant responded that his brother's car had been vandalized a couple of months earlier. All of the windows were broken. Defendant explained that he was "hella mad" about that and filed a police report. When asked why he thought the police might have decided to stop his car, defendant stated that his license plate tags had expired.

Asked whether he was in any gang, defendant responded that he was not, but said his cousin used to be in a gang. He said he could not recall the name of the gang, but, when Harris asked if it could be HNS, defendant responded that it could be. Defendant denied having any gang tattoos.

Earlier in the interrogation, defendant volunteered: "I'm going to be honest with you guys. I've been doing drugs. I don't really have [a] good memory." He said sometimes when he uses drugs, he does not remember things he did.

When later Harris asked defendant if he recalled driving around the area of Tiffany and 12th Streets, defendant stated that he did not. Harris then encouraged defendant to "think really hard" about it because "something happened over there and . . . I need things from your point of view." Harris said officers had talked to people who saw defendant's brother's car there. Defendant responded, "My brother's car was there?" Harris then told defendant that the city had brought back city surveillance cameras and these cameras were all over Stockton. He stated that there were people monitoring the cameras, and continued: "they definitely saw what a couple other people saw. They saw . . . your car. There in the same area. . . . when some stuff went down. And if there was any reason that you would have been over there like maybe you took your friend . . . over there . . . to . . . help him pick something up. To drop him off so he could talk to somebody . . . it's really important that I know that. Because that would be a good reason as to why your car would even be seen in that area." Defendant stated that he might have driven around the area. Defendant referred to someone his girlfriend knew in the area

who would bring drugs.  Harris told defendant that it was really important for defendant to remember whether he was in that area on that afternoon, and assured defendant he was "not here to knock you on the drugs . . . I don't care."  Defendant stated that he did not recall.

Harris told defendant that he had looked at the surveillance video, saw defendant's car and described it, and saw defendant get in the car and there was another individual in the front seat.  Harris then told defendant that, while the city cameras record video, they do not record audio.  He said the camera "doesn't lie about anything.  It just . . . shows the picture.  But the words are what's important."  Harris indicated he would have to rely on defendant and everybody else to determine what was said and everything that happened off camera.  Harris went on to state "the reason I'm asking about that place? . . . [T]hat intersection.  Is because some stuff went down.  And . . . things got out of hand but I don't know why they got out of hand."  Harris stated that the video showed defendant and his friend getting out of the car and talking to someone.  However, with no audio, Harris did not know what was said.  Harris told defendant "that's the part that I need you to fill in."  He continued, stating that defendant "talked to some guy that was pretty much in the front yard."  Defendant responded:  "Really?" and "I talked to some guy in a front yard?"  Harris said:  "I don't know what that whole thing was about" and defendant responded, "I don't recall it. … let me think."  Harris offered:  "I'll give you as much time as you need man.  Whatever you need.  Because, this is . . . important."  Defendant responded:  "Can I ask you what happened?  Cause I don't recall it." Harris responded:  "Sure.  Well . . . like I said I don't know what was said."  He then explained where the camera was located and said:  "So, your car is going to be parked somewhere over here on the street.  In the video I see the guy that you . . . call K and then . . . I see you and I see this guy kind of right here. … So it's like you guys are kind of standing in a triangle.  That's what the video [is] showing me.  . . .  [S]o it shows you guys get out and walk up.  And then you guys say something to this guy.  Or he says something to you.

10

And then . . . looks like some physical thing kind of breaks out . . . he got the worst of it. . . . Which isn't bad, it's not a big deal. [B]ut he got the worst of whatever happened. But I don't know what happened. But I don't know what caused what happened. That's the thing." Defendant asked: "What happened?" Harris responded: "See that's what I don't know. [A]ll I know is kind of got . . . the shit beat out of him. Is what it looked like." Defendant responded, "He got beat up?" And Harris said, "Well not really beat up but just . . . kind of. I don't know how to describe it. Kind of like . . . he got the worst end of it. [R]emember when I asked you if you? When is the last time you held a gun? Or had anything . . . like, went to a shooting range or had a friend that showed you a gun or anything like that? Because when we looked at this, we look at this video camera because it's a perfect angle. There's no trees or anything. And it looks like there's something in your hand. And so that's why I don't know if it was . . . you know a hammer. If it was a bat. If it was a knife . . . it wasn't big enough to be a bat though." Harris then stated that "from looking at the camera . . . it looked like it could have been a gun. Or a bigger knife. [T]hat's basically what it looked like to me. All I know is like some commotion goes on right here. . . . All of a sudden this guy goes down."

Harris then told defendant that the guy was in the hospital, and that he was "going to be ok" and "[h]e's going to be fine." Harris told defendant: "this stuff isn't a huge deal and when he gets better and everything goes to court . . . we're all going to sit around and we're going to tell . . . what happened. Like . . . your story, his story." Harris encouraged defendant to tell his side of the story to help himself out. Defendant stated: "I don't recall that" and continued, "So, now you got to tell me, tell me in detail see if I remember?"

Fry then interjected: "Ok Yor, check this out . . . . ..[T]his isn't your first time talking to police." Defendant responded: "I know." Fry then said: "[M]y partner is I believe gone above and beyond . . . staying on the right side of not being disrespectful. Treating you with the u[t]most respect, ok. You've dealt with some dick head cops.

11

You've dealt with some today . . . haven't you?" Defendant agreed. Fry stated: "They didn't have to go as far as they did? Did they?" Defendant again agreed. Fry told defendant, "Ok, they didn't. . . . [I]f we wanted to we can have you sit there in handcuffs, with a dog bite on your butt," and "Just point our fingers at you and just disrespecting you. It's not the way we do business." Fry continued: "[Y]ou're looking probably the two most easy going cops you're going to find." Fry then stated: "So, what we are trying to do in this whole thing and we can go on for hours and hours and hours. Ok. Is give you an opportunity, show you some respect by give you an opportunity to tell your side of the story. Ok. There are two sides. Two sides to every coin. Two sides to every story. We've got one. You're a smart man. You are even more street smart than probably we are."

Fry then told defendant, "What we don't want for you is you['re] sitting there [in a courtroom] and you have that guy get up and tell his side of the story about what happened. Tell a bunch of lies. And then on a piece of paper that he's going to write, we have a bunch of . . . I don't know, I can't remember. And yeah, drugs do crazy things to you." Frye continued: "What you're trying to do is see what we have. How much we know." Defendant denied that he was doing that and said: "I really don't remember sir. . . . I need to refresh my memory but I don't recall." Frye explained that they had done their "homework" and told defendant "if we came in here. And gave you everything that we know, what's left for you to tell us? You know what I'm saying?" Defendant indicated he understood. Fry continued: "So what we're doing is . . . we're seeing if you're going to tell us anything. So far, everything's been I don't know." Frye then explained: "if we're going to walk this journey together, then we need to walk it together not us leading you down a path. Something happened." He explained that whatever happened could be understandable, but the camera did not "tell us why." Defendant responded: "I understand." Harris then told defendant, "Only you can tell us why" and defendant responded, "I know." Harris then asked: "So why did this happen? From

your point of view. From your words. From your heart." Defendant responded: "My point of view?"

Defendant then volunteered he did not know who or why someone vandalized his car. He said his girlfriend saw who vandalized the car. Defendant emphasized that he had proof that his car had been vandalized. He then stated that, when he is at his girlfriend's house, "there's always people . . . trying to walk up on me . . . and creep up on me . . . ."

Defendant then stated that he went with his girlfriend to buy cigarettes at a market the previous night, and there he saw the person. Defendant's stepson was in the car. The guy "mean mugged" defendant and "stuck his hand in his pocket like, like he had something. Like something, he was going to do something." But there were "too many people" around. Defendant told the detectives: "So what that tells me is is this guy the guy who vandalize my car and try to kill me." Defendant said he thought the guy was going to shoot him, but he claimed he wanted to talk to the guy. He continued: "And when I confronted him, he told me what you going to do about it? I did what he was [unintelligible] going to do, but he didn't finish the job."

When asked about seeing the victim on the day of the shooting, defendant explained he was arguing with his girlfriend in the house when he saw the same guy walk by outside looking at his car and looking at the house. Defendant said he felt the guy was stalking him. Defendant went outside and the guy was gone, but defendant saw K down the street, and talked to him. He knew K would have a gun. Defendant told K he saw the guy, and K said he would go with defendant. Defendant and K got in the car. Defendant asked K, "You got a strap on you? Let me hold it. Let me get it in case you know . . . in case, if he pull, if he start acting stupid and acts like he's going to pull one, you know." They saw the guy approximately a block and a half from defendant's girlfriend's house. Defendant said he parked the car "like exactly what you said the camera sees," and went to confront the guy. Defendant, who was holding the gun, asked him "nicely" why he

13

looked at defendant like he was going to shoot defendant the day before. The guy said, "[W]hat you gonna do about it? You catch me slippin' you ain't doing nothing?" Defendant then said to the detectives: "Ok I'll do, do my job. You know."

Fry asked defendant how many times he fired the gun and defendant replied: "I don't recall it. I'm being honest with you." He continued: "I'll be honest with you, I don't recall how many times . . . how many bullets, was in that gun and how many shots were fired. I just remember pulling the trigger and my ear was sting . . . .." Defendant told the detectives, "[Y]ou don't have to believe me. But I have, . . . a vandalize everything record," and he said he had given his parole agent a copy. Fry explained they already knew about the vandalism and when they asked earlier if somebody had a beef with him or his family, they just wanted to see if defendant would tell them.

Fry asked if the victim fell down, stood up, or said anything, and defendant replied, "I'm going to be, . . . honest with you. I was in shock when I . . . pull the trigger. I don't remember what happened but I know I pulled the trigger." The next thing defendant said he remembered was getting in the car and driving away.

Defendant said he drove away from the scene slowly, "like an old person would dr[i]ve," like nothing happened. When police started following him defendant decided he needed to see his father, and he wanted to be sure his brother's car did not get impounded. Defendant said K left the car when one of the car's tires popped during the pursuit. Before leaving the car, K told defendant to give the gun back, saying "I'm not going to jail with you." Defendant believed that K took his gun with him.

Defendant explained that he had woke up on the wrong side of the bed that day. And the victim had been causing problems. Defendant further explained that when he went looking for the victim, it was his intent to confront him and "if he's a real man, we box." Fry asked defendant if, when he went looking for K prior to the shooting, he did so because he knew K would have a gun. Defendant replied that was not the reason.

14

Rather, defendant just wanted K to watch his back when he confronted the victim in case the victim had a gun, "[s]o he knows it's actually who, who he is."

The detectives offered defendant some pizza and left the room. Defendant sat there for a short while, put his head in his hands, then looked up and said something to himself that sounded like, "Don't matter [unintelligible]." Our review reveals that defendant immediately and clearly said thereafter: "I'd rather be a man and step up to the plate than be a punk about it."**8**

The detectives brought defendant pizza, and after defendant finished, the detectives reentered the room and the interrogation resumed. Fry encouraged defendant to disclose more information about K, stating that, without K, the detectives were faced with a "he said, he said," situation between defendant's statements and the victim's. Fry suggested that the victim could recover and refute defendant's account of the events, saying, "What if he says that guy[']s crazy. I was walking my dog skipping along the streets." Defendant immediately corrected Fry by responding: "[T]here was no dog."

When Fry asked defendant if K was involved with a gang, defendant responded: "Why was the guy . . . a gang member?" Fry subsequently said, "[Y]ou asked a[n] interesting question. You said . . . was that guy in a gang? [T]he guy that you got the confrontation with." Fry then asked: "Did you think he was in a gang?" Defendant responded: "I don't know. He was wearing red right?" Defendant then said, "I don't know," and "If he's in a gang well, I don't know. I don't know what I've gotten myself into." Defendant later asked if the guy was a gang member, and the detectives stated that they did not know. When Fry asked whether the victim was Hispanic, Asian, or Black,

---

**8** In the transcript, the entire conversation defendant had with himself is noted as "unintelligible," and some of what defendant said at this point is hard to understand, but we can clearly hear him say, "I'd rather be a man and step up to the plate than be a punk about it."

defendant responded that he was Asian, specified that he "looked [Hm]ong," and then stated, "Yeah he's [Hm]ong because I talked to him in [Hm]ong."

Before the detectives left the room, Harris thanked defendant for being honest. Defendant replied: "Thank you." He shook both detective's hands. Immediately after the detectives left the room, defendant can be heard to say to himself, "You know I'm doing right. At least I'm speaking with the truth. Life is going to hurt."

In their trial testimony, both Fry and Harris acknowledged that there were no city surveillance cameras at the location of Tiffany and 12th Streets as represented by Harris during the interview. Instead, prior to interviewing defendant, Fry and Harris had learned information from witnesses and officers at the location of the shooting. Harris acknowledged that he intentionally lied to defendant during the interview. Harris used this technique because he did not believe defendant was being truthful when defendant responded, "My brother's car was there?" after Harris said people had seen his car in the area.

**Autopsy Evidence**

The victim sustained six gunshot wounds and no other injuries. Four gunshot wounds were to the torso area, including the right arm, right buttocks, right back near midline and penis. The gunshot wound to his right arm traveled into his chest lacerating major blood vessels close to the heart. The gunshot wound to the right back travelled upwards, perforating the right lung and exited out of the right chest.

Two of the gunshot wounds were to the head. One entered the upper right neck near the scalp, traveled downwards through the neck, transected the spinal cord and fractured vertebrae. This wound would have resulted in spinal shock causing the victim to become immediately unresponsive. The other was a graze wound. A cluster of abrasions and lacerations to the scalp and miniscule bullet fragments recovered therefrom indicated that the bullet that caused the graze wound impacted a hard surface and shattered near the victim's head and ricocheted back into the victim's scalp, suggesting

16

the victim's head may have been close to the concrete when that bullet wound was inflicted.

### Gang Expert Testimony

Detective Richard Slater, assigned to the Gang Violence Suppression Unit, testified as a gang expert, specializing primarily in Asian gangs. Slater testified that the victim was a documented gang member. According to Slater, a tattoo on the victim's back, which read "MOD," could stand for the gang Masters of Destruction or Menace of Destruction. According to Slater, in Stockton, MOD was a primarily Hmong gang which "could fall under a Blood gang, they associate with the color red." At the time he was shot, the victim was wearing a red shirt and a red cap.

Slater testified that MOD and HNS, or Hmong Nation Society, were rival gangs. HNS was a criminal street gang and a Crip set associated with the color blue. As of the time of trial, HNS had approximately 10 validated members. According to Slater, the primary activities of HNS included homicide, firearms violations, assault with a deadly weapon, robbery, burglary, and fraud.

Slater documented defendant as a validated member of HNS based on the facts of this case, prior contacts, statements defendant has made to law enforcement, and who he was with during an arrest in 2006. Slater further opined that defendant shot the victim for the benefit of, at the direction of, or in association with HNS. According to Slater, defendant would have been "getting rid of the rival." [9]

Slater explained that, to be "caught slipping" means to be caught without a firearm with which to protect one's self against a rival; "you're caught out in the open with no way to defend yourself."

---

[9] In the unpublished portion of this opinion *post*, we discuss in more detail Slater's testimony concerning the basis for his opinion about defendant's gang membership.

Slater noted that defendant was purported to have said to the victim, "Fuck you, cuz, that's for fucking with my family." Slater explained that if a Crip gang member calls a Blood gang member "cuz," that can be a derogatory, disrespectful statement that can lead to an altercation. Consequently, he construed defendant's remark to the victim as derogatory and gang-related. (3 RT 890) Slater also testified that "mean mugging" is staring at someone in a derogatory manner, and that it is very disrespectful for a gang member to "mean mug" a rival gang member. If a gang member "mean mugs" a rival gang member, that usually serves as a call for the rival gang member to do something about it.

Asked whether defendant's statement -- "Well, he was wearing red, right?" -- had any relevance to Slater, he responded, "Yes, he knew that he was a gang member."

### Defendant's Case

Defendant testified. He said he was addicted to methamphetamine and had been using for approximately eight or nine years. He had been to rehab programs, but had not been successful in quitting. Defendant acknowledged that he had previously been convicted of a felony and testified that he was on parole and, on the day he was arrested, he knew he had an outstanding warrant for failing to go to drug court.

Defendant testified that he was in his car with K at the intersection of Dr. Martin Luther King, Jr., Boulevard and Airport Way waiting for the traffic signal to change. When the light changed, defendant drove through the intersection. A police car then came up behind him with its lights and siren on. Defendant drove to the side of the road so that the police car could pass him. When the police car remained behind his car, defendant thought he was going to be arrested for his expired vehicle registration and the outstanding warrant, so he drove off.

Defendant sped up and the police car pursued him. Defendant figured he was going to jail regardless. He intended to get home to see his father for a moment before

being taken into custody. He also hoped that if he made it home, his brother's car would not be impounded.

Defendant acknowledged that when he was fleeing from the police, he was driving anywhere between 60 and 80 miles per hour on Stockton surface streets and that he disregarded stop signs and red lights. He also acknowledged driving on the wrong side of the roadway. Defendant made a turn and briefly lost control of his car. He slowed down for a moment, and, at that point, K got out of the car, exiting through the sunroof. The pursuit ended when defendant arrived across the street from his house.

After defendant stopped, officers pointed their guns at him. Kwan ordered him to the ground and to place his hands over his head. Defendant testified that he complied without resistance and Kwan handcuffed him. While being handcuffed, defendant felt an impact on his head and shoulders. He then felt a sharp pain on his buttocks and thigh. Police then placed him in a police car. Defendant testified about the various injuries he sustained during the arrest, including the dog bite.

Defendant went on testify that, approximately 30 minutes after being given Vicodin at the hospital where he was treated for his injuries, he was taken to a police building. He told the jury he was feeling "very light and dizzy and tired." Defendant was then interviewed by Fry and Harris. He had not been informed, and did not know, he was a suspect in a shooting. He thought detectives wanted to talk to him about why he drove away from police.

Defendant testified that he did not know what Harris was talking about when Harris told him that his brother's car had been seen near Tiffany and 12th Streets. He testified that the car had not been at that location that day. Defendant also said he did not know what Harris was talking about when Harris said he saw defendant and another individual approach a third person, something going down, and the third person getting the worst of it. Defendant testified that he and K had not been involved in any

19

confrontation with anyone at that location. He also testified that he was not in possession of a gun and he did not see K with a gun. He denied shooting the victim.

When asked why he did not tell the detectives that there was a mistake, that it was not him at that location, defendant responded: "Because I was afraid of them. I only answered and told them that I didn't remember." When Fry told defendant that "this could go on for hours and hours and hours," defendant understood that he meant that the interview would go on for hours "until [defendant] told them what they wanted to hear." When Fry said "they could be assholes like the cops before and have you in handcuffs and sitting on your dog bite," defendant took this to mean, if he did not do what Fry asked, "that he could also do what they did to me."

Defendant testified he then began to talk to the detectives about the guy who mean mugged him at the store the night before, which had actually happened. However, he claimed when he told the detectives that he saw the same person in his girlfriend's neighborhood the next day, that was not true. Nor was it true that defendant went out looking for the guy, or that he enlisted K's assistance in looking for him. Defendant testified he did not ask K if he had a gun. Defendant did not see the individual on the street, and he did not confront him. Defendant acknowledged telling Fry, who asked which hand he held the gun in, that it must have been his right hand because he was right-handed. Defendant testified that this was not true, and that he was making up a story that sounded good. Defendant further testified that he did not speak to the victim in Hmong, and, in fact, he never spoke to him at all.

When asked why he said all of these things, defendant responded; "I was afraid. I was afraid of them. And they told me a story, so I just added to the story. I added to the story because I was afraid of them and I wanted the story to sound good." When asked what he felt after the detectives stopped asking him questions, defendant responded: "I felt that after they asked me and I had told them the story that they wanted me to tell them, and they said that the victim was not dead, so I thought that when he recovers and

he comes and look at me, he'll say that it wasn't me who shot him, it wasn't me who confronted him."

Defendant gave an explanation for why he responded to the detectives' question about whether the victim was in a gang with, "Well, I don't know. He was wearing red, right?" He said that "[b]ecause in the area where my girlfriend lives, there was a lot of gang activities. There's a lot of gangsters. And most of the gangs consist of blue and red. But there was a lot more red, so I mentioned that, because I sort of think that could be." Defendant testified that he did not know whether the victim wore a red hat or a red shirt. He said he did not know the victim at all, and had never seen him.

On cross-examination, defendant testified that the following things he told Harris and Fry were lies: that the day he was arrested, he saw the person who had mean mugged him the night before; that he got out of his car on 12th and Tiffany, walked up to the guy and confronted him about what had happened; that he spoke to the victim in Hmong; that the victim said to him, "Well you caught me slippin'. What are you [g]oing to do about it"; that he shot the victim; and that he got back into his car and drove away. He said the following things he told the detectives were true: that he had had an argument with his girlfriend earlier; that he fled from the officers at a high rate of speed; that K jumped out of the car; that he had been mean mugged by a guy with a ponytail at the liquor store the previous evening; and that his car previously had been vandalized.

Defendant introduced evidence that no gunshot residue was detected on hand samples taken from him.

Dr. Richard Leo, a Professor of Law at the University of San Francisco, testified as an expert in false confessions, interrogation techniques including psychologically coercive interview tactics, unreliable statements, and the distinction between interviews and interrogations. Dr. Leo reviewed, among other things, the recorded interrogation by Harris and Fry.

21

Dr. Leo testified that a danger of confronting a suspect with false evidence during an interrogation is that it can increase the risk of eliciting a false confession from someone who is actually innocent. Three groups of people have been identified as being particularly susceptible to making false confessions: juveniles, people with cognitive impairments and low IQs, and people with "mental illnesses or what is sometimes called reality monitoring disorders." Dr. Leo also testified that there could be other factors that may make someone more vulnerable to giving false confessions, including intoxication and cultural reasons. Cultural reasons include cultural teachings that it is disrespectful to disagree with authority or "where people are afraid that because of where they come from, if you don't do what you're told you will be tortured." Additionally, some individuals simply have very suggestive or compliant personalities.

Dr. Leo testified that among the materials he reviewed in preparation for his testimony was a report by Dr. Daniel Lee, a clinical psychologist. Dr. Lee opined that defendant has a "compliant personality." Dr. Leo explained that compliant personality "refers to submissiveness or acquiescence, people who tend to do what they are told, follow orders, not resist, not rebel, kind of go along with what people are saying, particularly authority figures."

Dr. Leo also testified that there is a danger related to "contamination" in an interrogation or transference of nonpublic information concerning a case. If nonpublic case information is communicated to the subject, there is a danger that an innocent person who confesses falsely will incorporate the details communicated into their confession, rendering their false confession more persuasive and adding a degree of verisimilitude. He testified that police are trained not to contaminate suspects with non-public facts, rather police "let them supply it."

Dr. Leo did not identify an example of contamination in defendant's recorded interrogation. On cross-examination, Dr. Leo acknowledged that the detectives did not mention that the victim was wearing red clothes. He also acknowledged that the fact that

22

defendant knew the ethnicity of the victim might be an indicator of reliability. Dr. Leo explained that "[i]f somebody possesses personal knowledge of non-public crime facts that are not likely guessed by chance, were not fed to them by the police, or they didn't learn from [the] media or community gossip or some other source, and these are truly unlikely guessed by chance, that would be indicia that the confession or statement is reliable because it reveals personal knowledge. Exactly what the police training manuals say."

He noted that another way to determine reliability is to look to whether the statements fit the "crime facts" and physical evidence. A wrong guess could be indicia of unreliability, except when there is a motive for the suspect to get the fact wrong.

Dr. Leo testified that the incorporation of false evidence and the use of coercive interrogation techniques appear in a high percentage of proven false confession cases. According to Dr. Leo, one type of false confession is "compliant," where the individual is so worn down and psychologically distressed by interrogation that he or she just wants to get out of the interrogation room and end the pressure being exerted. Such individuals will make up or agree to a story they know to be false just to put an end to the interrogation.

When defense counsel asked Dr. Leo, based on his review of defendant's recorded interrogation, whether he had an opinion on whether coercive techniques were used during defendant's interrogation, Dr. Leo testified, "I don't know whether coercive techniques were used, but . . . I think that it's possible that [defendant] felt coerced by the interrogation." He further testified "I didn't see a lot of classic coercive techniques, but the defendant may have experienced, nevertheless, that what did occur, given his particular background or perception, as psychologically coercive." Dr. Leo also identified a number of the interrogation techniques used by the detectives here, including: accusations, challenging defendant's statements and lack of response, contradicting his claims that he did not remember details, confronting him with false evidence, minimizing

23

his culpability to incentivize admissions, and downplaying the seriousness of his involvement and the consequences. But he acknowledged that the "kinds of threats and promises that you often see in interrogations that are clearly psychologically coercive were not present here." He testified that the technique that stood out in defendant's interrogation was reference to false evidence, but he also acknowledged that law enforcement is permitted to confront suspects with false evidence during an interrogation.

Dr. Leo also agreed that suspects sometimes ask the officers for information, and further acknowledged that defendant asked the detectives for details, although he said that "might be a little different than show me your cards." When asked about defendant's repeated requests that the detectives refresh his memory, Dr. Leo agreed that this conduct could fall into the category of "show me your cards, what have you got against me," but also testified, "it could be the person, as you see sometimes in false confession cases, can't confess because they don't know the details."

Dr. Leo conceded that most confessions are probably true. On cross-examination, the prosecutor asked, "you . . . agree that specific facts that fit logically and that fit the extrinsic evidence of the case would indicate or would be an indication that it's probably true as opposed to a false confession?" Dr. Leo responded, "[A]bsent contamination and the degree to which it's not likely guessed by chance, correct."

**Verdict and Sentencing**

The jury found defendant guilty of murder in the first degree (§§ 187, subd. (a), 189), and found true the enhancement allegation that, in committing murder, defendant personally discharged a firearm causing the victim's death (§ 12022.53, subd. (d)).[10] The jury also found defendant guilty of possession of a firearm by a felon (§ 29800), and

---

[10] The jury was apparently not asked to consider the firearm use allegation charged under section 12022.5, subdivision (a), and the trial court struck that enhancement on the day of sentencing.

felony evasion (Veh. Code, § 2800.2, subd. (a)). The jury deadlocked on the gang enhancement allegations, and the trial court granted the prosecution's motion to strike those allegations.

The trial court sentenced defendant to 50 years to life plus two years eight months, calculated as follows: 25 years to life on count 1, murder in the first degree, plus 25 years to life for the personal use of a firearm causing death enhancement; the upper term of three years on count 2, possession of a firearm by a felon, with execution of that sentence stayed pursuant to section 654; eight months (one-third midterm), on count 3, felony evasion, and two one-year terms for prior prison term enhancements pursuant to section 667.5, subdivision (b).

## DISCUSSION

### I. Defendant's Cultural Perceptions of Law Enforcement

### A. Additional Background and Defendant's Contentions

Defendant testified that he is Hmong. His parents were from Laos, and he was born in a refugee camp in Thailand. He testified that he came to the United States when he was seven years old.

Regarding his experience in the refugee camps, defendant's trial counsel attempted to elicit defendant's understanding of a person's ability to deny allegations made by police officers in the refugee camps. The following is from direct examination:

"[DEFENSE COUNSEL:] [D]id you ever have any dealings with the [police] officers . . . in the refugee camp?

"[DEFENDANT:] No. Me personally, I have not dealt with them. But I have seen them punish other people and attack other people.

"[DEFENSE COUNSEL:] Now in terms of police officers in the refugee camp, what was your understanding, if any, about being able to say no or deny an allegation by them?"

25

The prosecution objected and counsel for defendant requested a bench conference. The trial court sustained the objection "as calling for a conclusion."

Defense counsel proffered: "My client has testified before concerning why he didn't respond or why he did respond the way that he did to the allegations made by the officers during the interview, and which he never denied it, but he merely claimed a lack of recollection. And I would offer his testimony to establish that that is a cultural thing that he learned growing up in the refugee camp." The trial court again ruled, "I am sustaining the objection as calling for a conclusion."

It appears that defense counsel's comment about defendant's prior testimony referenced testimony defendant gave in an Evidence Code section 402 hearing, which was held to determine the voluntariness of defendant's recorded statement. In that hearing, defendant testified about how he was injured by officers during the arrest on the instant charge and that he feared the police as a result. He testified that instead of denying accusations during the interrogation, he repeatedly stated he did not remember because he was afraid of the police. He believed that if he refused to answer the detectives' questions, they would "beat [him] again like they did." He did not, however, testify about his experience in the refugee camps.

Defendant asserts that the trial court abused its discretion by excluding his testimony concerning his understanding of a person's ability to deny accusations leveled by police officers in the refugee camps. Defendant asserts that his understanding of whether a person could say no to officers in the refugee camp or deny allegations made by them was relevant to his contention that admissions he made during the interrogation with Harris and Fry were false and that he made those statements because he was afraid not to go along with the detectives' narrative. Defendant contends that, contrary to the trial court's determination, this evidence did not call for a conclusion, but rather for his understanding and mental state during the interview with the detectives, which were informed by his experiences in the refugee camp. According to defendant, this excluded

26

evidence constituted circumstantial evidence of his fear of police officers and his conduct during the interrogation, and it would have supported his credibility as to why he made false admissions to the detectives. We agree, but as we shall explain, the refusal to allow this testimony was harmless.

## B. Relevance Principles

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) " ' " 'The test of relevance is whether the evidence tends, " 'logically, naturally, and by reasonable inference' to establish material facts." ' " ' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1001.) "[T]he court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony . . . ." (Evid. Code, § 780.) An appellate court reviews a trial court's decision to exclude evidence for abuse of discretion. (*People v. Peoples* (2016) 62 Cal.4th 718, 745.)

## C. Forfeiture

The People assert that defendant forfeited this issue because trial counsel did not make a sufficient record or object to the trial court's ruling on the grounds defendant asserts here. We disagree. It is true that " '[T]o preserve an alleged error for appeal an offer of proof must inform the trial court of the "purpose, and relevance of the excluded evidence . . . ." ' " (*People v. Valdez* (2004) 32 Cal.4th 73, 108 (*Valdez*).) Here, defense counsel attempted to elicit testimony from defendant concerning *his understanding* of whether refugee camp residents could say no to officers in the camp or deny allegations made by the officers. Defense counsel referenced defendant's prior Evidence Code section 402 hearing testimony and asserted that defendant's understanding of this matter was "a cultural thing that he learned growing up in the refugee camp." We conclude that

this was sufficient to preserve defendant's contention for appellate review.**11**  (See

generally *Valdez*, at p. 108.)

---

**11** Defendant contends he was denied constitutionally effective assistance of counsel based on the way counsel handled this issue.  We note that defense counsel's offer of proof after the prosecution's objection to defendant's testimony may have been more persuasive had he explained on the record the specific answer he anticipated defendant would give and connected defendant's answer to Dr. Leo's proposed testimony concerning how cultural experiences might produce false confessions.

   We also note that prior to trial, defendant moved to introduce Dr. Leo's testimony concerning "the phenomena of false confessions."  The trial court reviewed the written submissions and heard argument, but postponed ruling on that in limine motion until the end of defendant's case-in-chief based on *People v. Ramos* (2004) 121 Cal.App.4th 1194, 1207.  The court later allowed Dr. Leo's testimony based on defendant's trial testimony. In his brief in support of the in limine motion, defendant indicated that Dr. Leo reviewed Dr. Lee's report.  As part of Dr. Lee's evaluation of defendant, Dr. Lee "determined the following:  [Defendant] was born in the Ban Vinai Refugee Camp in Thailand and lived in various refugee camps until he reached the age of eight or nine; that *[defendant] perceived the camp guards as authoritative figures who were not to be questioned and with whom a refugee camp resident was not to disagree at the risk of being jailed, beaten or disappeared; that [defendant] possessed the same perception and attitude toward authoritative figures, police officers in this case, as the residents at the refugee camp."* (Italics added.)  Presumably, the italicized text represented what defendant told Dr. Lee and approximates how he would have answered the question posed at trial at issue here. Defendant went on to state in his in limine motion that Dr. Leo would testify "why certain personality traits increase the risk that someone may give a false confession in response to police interrogation techniques."  Based on the fact that the court had not yet ruled on whether it would permit Dr. Leo to testify and the court's ruling on the objection to defendant's testimony as reflected in the record before us, it appears that any further argument by trial counsel may have been futile.  (See, e.g., *People v. Price* (1991) 1 Cal.4th 324, 387 [counsel "does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile"].)  In any event, even if trial counsel should have made a better offer of proof, we conclude *post* that defendant suffered no prejudice.  Thus, defendant's alternative contention that he was denied constitutionally effective assistance of counsel fails.  (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [80 L.Ed.2d 674, 693-694, 696] (*Strickland*) [to prevail on a claim of constitutionally ineffective assistance of counsel, defendant must establish both deficient performance and prejudice]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218 (*Ledesma*) [same].)  To show prejudice, defendant must

28

## D. Analysis

We have found no published California cases addressing the issue presented here. However, we agree with defendant that the trial court erred in excluding the proffered testimony. This evidence was relevant to defendant's state of mind during the interrogation, how he perceived the detectives, and his conduct and responses during the interrogation, all of which was relevant to defendant's claim that he made false admissions based on fear of the detectives and his desire for the interrogation to end. (See generally Evid. Code, § 210 [relevant evidence]; cf. *People v. Edwards* (2013) 57 Cal.4th 658, 726 [state of mind evidence must be relevant].) "People learn from their experiences. Even when those experiences occurred long ago, the knowledge gained from such experiences can be retained and recalled in the future." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 242, 243 [holding that past experiences may be relevant to knowledge a defendant has at the time of the offense for purposes of Evidence Code section 1101, subd. (b), and establishing the knowledge element of the charged offense].)[12] While the answer to the question posed to defendant may have called for a

show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, at pp. 693-694; *Ledesma*, at pp. 217-218.) This is essentially the same standard applied in reviewing state evidentiary error under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1407, fn. 4.)

[12] We do not imply that such testimony is necessarily relevant in a pretrial suppression hearing on the issue of due process voluntariness, where the predicate to a due process violation is state action. (*Colorado v. Connelly* (1986) 479 U.S. 157, 164, 167 [93 L.Ed.2d 473] ["Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law"].) Thus, absent police exploitation of a suspect's vulnerabilities, the mere existence of a vulnerability does not lead to a due process violation. (See *id.* at pp. 164-165 [absent police exploitation of the defendant's mental illness, there is no due process violation]; *People v. Hogan* (1982) 31 Cal.3d 815, 838, disapproved on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771, 836 [statements were coerced by police offering help for defendant's mental illness, suggesting that defendant committed

conclusion or an opinion, it was defendant's conclusion based on his life experience, and his opinion and perception had a direct bearing on his state of mind during the interrogation. Additionally, the jury could properly consider this evidence in determining defendant's credibility concerning his recantation of the interrogation admissions. (Evid. Code, §§ 210 [relevant evidence includes evidence relevant to the credibility of a hearsay declarant], 780 [in determining the credibility of a witness, jury may consider any matter that has any tendency in reason to prove or disprove the truthfulness of the witness's testimony].)

The People argue that under Evidence Code section 800, which pertains to opinion testimony offered by a lay witness,[13] "a 'lay witness generally may not give an opinion about another person's state of mind, but may testify about objective behavior and describe behavior as being consistent with a state of mind." However, the question defendant was asked on direct examination did not call for an opinion concerning the

_____

murder because of mental illness and the mental illness prevented him from remembering the crime].) Thus, in a suppression setting, the defendant's cultural experiences may be irrelevant unless the police exploited those experiences. (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1098, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151 [in the suppression hearing, trial court properly excluded defense expert testimony about how defendant's experiences in Guatemala affected his understanding of the interrogation and defendant's testimony that he believed he had to submit to police questioning because in Guatemala, the police would torture or kill him if he did not cooperate; defendant's proffered testimony would only establish that his pressure "sprang from himself" and thus, as a matter of law, this did not involve state coercion and no causal link existed between defendant's internal pressure from his experiences with the Guatemalan police and any police activity in this case].) In any event, no state action or police exploitation need be proven when a defendant seeks to establish at trial that he was coerced or felt coerced in an effort to explain why he gave a false confession and/or why his statements were not reliable.

[13] Evidence Code section 800 provides: "If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony."

state of mind of any officer in the refugee camp or of any other camp resident concerning the officers in the camp; based on the record before us, defendant was going to testify concerning *his own mental state and state of mind* relative to officers in the camp based on his own observations and perceptions.  When asked if he had personal dealings with police officers in the refugee camps, defendant responded, "No.  Me personally, I have not dealt with them.  But I have seen them punish other people and attack other people."  He was then asked for his understanding about "being able to say no or deny an allegation by them," and the court sustained the prosecutor's objection to this question.

"A ' "lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony." ' " (*People v. Dalton* (2019) 7 Cal.5th 166, 231 [child protective services worker's opinion that the murder victim whose body was never found loved her children and would not abandon them was based on the worker's personal observations of and conversations with the victim and was properly admitted].)  Contrary to the trial court's determination, the answer to the question calling for defendant's understanding was not testimony that called for an improper opinion or conclusion.  Rather, as we have said, this was evidence of defendant's state of mind, which, under the circumstances presented here, was relevant to the false confession defense.

We conclude that the preclusion of this testimony was error, but as we next discuss, the error was harmless.

### E.  Harmless Error

#### 1.  Standard of Review

Defendant asserts that constitutional principles related to his right to present a defense and to a fair trial are in play here.  He contends that the trial court's ruling deprived him of his right to present a defense, and, accordingly, the potential harmlessness of this error must be considered under the standard in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] (*Chapman*).  However, if the error is

simply one of state evidentiary law, then we apply the harmless error standard in *Watson*, *supra*, 46 Cal.2d 818. (*People v. Boyette* (2002) 29 Cal.4th 381, 427-428.) Accordingly, our harmless error review here requires that we: (1) determine whether a constitutional right was violated, and then (2) apply the appropriate harmless error standard depending on the answer to the first question. Thus, we first determine whether, as defendant asserts, the exclusion of defendant's understanding regarding refugee camp police violated his right to present a defense and thus his due process right to a fair trial. On this point, we find instructive *Crane v. Kentucky* (1986) 476 U.S. 683 [90 L.Ed.2d 636] (*Crane*).

In *Crane*, the United States Supreme Court held that exclusion of testimony at trial of the circumstances of a defendant's confession relevant to voluntariness violated the defendant's constitutional right to present a defense. (*Crane*, *supra*, 476 U.S. at p. 687.) The state trial and appellate courts had held that evidence of the circumstances bearing on the issue of voluntariness was properly excluded from the jury trial because the issue of voluntariness had been decided by the trial court pretrial. (*Id*. at pp. 686-687.) Rejecting that conclusion, the high court reasoned that evidence concerning the circumstances surrounding the confession bears on the credibility of the confession, and noted that a defendant may "challenge the confession's *reliability* during the course of the trial." (*Id*. at p. 688.) In other words, the manner in which the confession is secured is "germane to its probative weight, a matter that is exclusively for the jury to assess." (*Ibid.*) The court further observed, "stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?" (*Id*. at p. 689.) The court went on to note that the "an essential component of procedural fairness" associated with due process "is an opportunity to be heard." (*Id*. at p. 690.) "That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of

32

a confession when such evidence is central to the defendant's claim of innocence." (*Ibid*.) Acknowledging the "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts" and "the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability," the court wrote: "we have little trouble concluding on the facts of this case that the *blanket exclusion* of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial." (*Id*. at pp. 689-690, italics added.) The defendant was deprived of " 'a meaningful opportunity to present a complete defense.' " (*Id*. at p. 690, quoting *California v. Trombetta* (1984) 467 U.S. 479, 485 [81 L.Ed.2d 413] (*Trombetta*).) In remanding the matter to the state courts to determine whether the error was harmless, the *Crane* court cited *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680-681 [89 L.Ed.2d 674], which applied the harmless error standard in *Chapman*, *supra*, 386 U.S. at p. 24. (*Crane*, at p. 691.)

Here, the issue presented is not the circumstances under which a confession or admission was obtained. Nevertheless, the excluded evidence was germane to the probative weight to be given to the confession by the jury. (See generally *Crane*, *supra*, 476 U.S. at p. 688.) Thus, defendant's right to present a defense as to the credibility of the confession was potentially implicated. However, we conclude defendant was not deprived of " 'a meaningful opportunity to present a complete defense.' " (*Id*. at p. 690.)

In *People v. Page* (1991) 2 Cal.App.4th 161 (*Page*), the court applied *Crane* and concluded that the exclusion of certain evidence did not deprive the defendant of a meaningful opportunity to present a complete defense. There, the trial court excluded aspects of an expert's proposed testimony concerning the reliability of the defendant's confession. (*Id*. at p. 183.) The proposed testimony fell into three categories: general psychological factors that might lead to an unreliable confession; the particular evidence in the defendant's recorded statements which indicated those psychological factors were present; and the reliability of the defendant's confession given the overall method of

33

interrogation. (*Ibid*.) The court permitted testimony from the first category, but excluded testimony concerning the other two. (*Ibid*.) Like in many cases involving *Crane*, defendant challenged the constitutionality of the trial court's ruling, without challenging the state evidentiary basis. Addressing the claim that preclusion of the evidence violated the defendant's right to present a defense and his right to fair trial, the *Page* court found no constitutional error. (*Id*. at pp. 184-185.) It noted that the *Crane* court had concluded, "on the facts before it," that " 'the *blanket exclusion* of the proffered testimony about the circumstances of [the defendant's] confession deprived him of a fair trial.' " (*Id*. at p. 185, quoting *Crane*, *supra*, 476 U.S. at p. 690, & *Trombetta*, *supra*, 467 U.S. at p. 485.) But the *Page* court determined there were "obvious and important differences" between the case before it and *Crane*. (*Page*, at p. 185.) In *Page*, the trial court permitted the defendant and the prosecutor to thoroughly explore the physical and psychological environment in which the confession was obtained. (*Ibid*.) Additionally, the defendant testified and presented his own version of the interrogation, explaining in detail how his statement came about. The trial court allowed the expert to testify to the psychological factors which could lead to a false confession, and defense counsel made the connection to those factors in closing argument. (*Id*. at p. 186.) Thus, the *Page* court concluded that the excluded expert testimony was a "far cry from the 'blanket exclusion' of evidence the Supreme Court faced in *Crane*. Unlike Crane, Page was not 'stripped of the power to describe to the jury the circumstances that prompted his confession,' " and "that power was, at most, *marginally curtailed*. Consequently, in our view, the trial court's ruling did not deprive Page of ' "a meaningful opportunity to present a complete defense." ' " (*Page*, at p. 186, quoting *Crane*, at pp. 689, 690, italics added, fn. omitted.)

The same holds true here. Like *Page*, defendant was allowed to mount a defense challenging the credibility of the confession. Defendant testified that he did not shoot the victim. Similar to the defendant in *Page*, defendant explained how the confession came about. He explained that, confronted with Harris's representations concerning the

34

fictitious city surveillance camera recording, he did not tell the detectives that there had been a mistake and that it had not been him at that location "[b]ecause I was afraid of them. I only answered and told them that I didn't remember." When Fry told defendant that "this could go on for hours and hours and hours," defendant testified that he understood that to mean that the interview would go on for hours "until [defendant] told them what they wanted to hear." When Fry said that "they could be assholes like the cops before and have you in handcuffs and sitting on your dog bite," defendant testified that he understood this to mean that, if he did not do what Fry asked, "that he could also do what they did to me." Defendant testified that, in talking with the detectives, he made up a story that sounded good. When asked why he said all of the things he told the detectives, defendant responded: "I was afraid. I was afraid of them. And they told me a story, so I just added to the story. I added to the story because I was afraid of them and I wanted the story to sound good."

In addition to defendant's testimony, Dr. Leo's testimony provided evidence supporting defendant's false confession defense. Although defendant was not able to connect his testimony about his experience in Thai refugee camps to Dr. Leo's testimony that cultural experiences might explain why a person would give a false confession, Dr. Leo did testify that some individuals simply have very suggestive or compliant personalities. He noted that Dr. Lee had diagnosed defendant with compliant personality disorder and explained that disorder. He also testified about several factors that might lead to false confessions. Trial counsel thoroughly cross-examined both Harris and Fry about the interrogation, including some questions about the techniques they employed. Some questions were obviously geared toward establishing the false confession defense. For example, counsel asked Fry, "in terms of your training, are you ever cautioned about using false evidence because you may end up with a false confession," to which, Fry responded, "no." Trial counsel told the jury in closing argument that it is difficult to

35

understand why a person would confess to something he did not do and then explained why that would happen, referencing Dr. Leo's testimony.

While defendant was improperly precluded from testifying concerning his understanding of whether a person could say no to officers in the refugee camp or deny allegations made by them, there was ample evidence admitted on his contention that he falsely confessed because he was afraid of the detectives and essentially felt he had to tell them what they wanted to hear to end the interrogation uninjured. Similar to *Page*, we conclude defendant's right to present a defense was only "marginally curtailed." (*Page*, *supra*, 2 Cal.App.4th at p. 186.) Unlike in *Crane*, defendant here was able to provide an answer to the question: "If [he] is innocent, why did he previously admit his guilt?" (*Crane, supra,* 476 U.S. at p. 689.) There was no "blanket exclusion" of a defense and he was not deprived of a " 'meaningful opportunity to present a complete defense' " on this point. (*Id*. at p. 690; see also *People v. Fudge* (1994) 7 Cal.4th 1075, 1103 [excluding defense evidence on a "subsidiary point" does not impair an accused's due process right to present a defense].)

### 2. Harmless Error Review

Having concluded there was no constitutional violation resulting from the trial court's error, we employ the standard for harmless error review set forth in *Watson*, *supra*, 46 Cal.2d 818, and inquire whether it is reasonably probable that, but for the error, the jury would have reached a result more favorable to defendant. (*Id*. at p. 836.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v.*

36

*Beltran* (2013) 56 Cal.4th 935, 956.) We may also consider the arguments of counsel. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130 (*Guiton*).)

The jurors were able to view and scrutinize the video recording of the interrogation and evaluate defendant's credibility during the interrogation and when he testified. Our review of the recording reveals that, contrary to defendant's testimony, he did not add to a story fed to him by the police. And defendant's demeanor as can be seen on the video does not appear to be that of a person who was afraid of his interrogators. Indeed, at one time he joked about being hungry enough to eat a whole pizza. Moreover, there was overwhelming evidence that defendant's confession was not false and that he was the person who shot the victim here.

As to the false confession defense, we begin with Dr. Leo's testimony about contamination, because the evidence demonstrates that the detectives never told defendant that the crime they were investigating was a shooting and never expressly told him the victim had been shot.[14] Nor did defendant testify he had learned information leading him to believe that the victim had sustained gunshot wounds as opposed to some other injury. Yet, defendant confessed that he shot the victim. Even when defendant pressed the detectives for detail, they were vague about what the fictitious surveillance cameras showed during the altercation. Harris explained, that "at every step [of the

---

[14] Defendant testified that he learned some information from radio communications he overheard while detained in the patrol car. He testified that he heard mention made of an Asian person and the name was a Hmong name, so defendant's reference to the victim being Hmong during the interrogation could theoretically have been contaminated by this exposure to the radio communications, if there were any such communications. Defendant also testified that he "wasn't really listening" to the radio and the name of the Asian person was the only thing he heard. Harris testified that he did not believe there was radio traffic about this case after defendant was apprehended. Harris also testified that nobody had informed defendant he was a suspect in a shooting prior to the interrogation, and defendant did not testify that anyone had. Also, defendant did not testify that he overheard radio communications about a shooting.

interrogation] I'm trying to go a little farther without giving him information because I want him to give me original information back." During the interrogation, Harris mentioned a number of possible weapons. Ultimately, Harris told defendant "from looking at the camera … it looked like it could have been a gun. *Or a bigger knife.* [T]hat's basically what it looked like to me. All I know is like some commotion goes on right here. . . . All of a sudden this guy goes down." (Italics added.) About this statement, Harris testified, "I didn't want to give him any specific information, I wasn't trying to focus him anywhere, I was just still trying to elicit a truthful response from him at that point. . . . I threw out anything that could be used as a weapon . . . I didn't want to tell him a story to tell me back, I wanted to give him generalities, and if he chose to tell me the truth back at some point, then that's what I had wanted." Fry testified, "In fact, Detective Harris said it could have been a knife, a hammer, a gun. He didn't lead him on to a story that Mr. Xiong just agreed to." When faced with the choice of the victim having potentially been shot or stabbed or injured with some other weapon, defendant explained how and why he shot the victim.

When discussing with defendant the victim's potential gang membership, defendant said, "He was wearing red right?" In his testimony, Harris indicated that he did not take this question as an inquiry by defendant. Rather, according to Harris, defendant said it, "Like obviously, it's kind of how I took that. It was like I should know and Detective Fry should already know since he is wearing red. He, to me, is inferring that he is in a gang." Our review of the interrogation recording is consistent with Harris's interpretation. The detectives did not tell defendant that the victim was Hmong[15] or that the victim had his hair pulled back or that he was wearing red. The evidence established that the victim was a member of a Hmong gang and wore his hair in a ponytail. He was

---

[15] But see footnote 14, *ante*.

wearing a red hat and shirt when defendant shot him. When Fry suggested that the victim could recover and refute defendant's account of the events, saying, "What if he says that guys crazy. I was walking my dog skipping along the streets," defendant immediately corrected Fry by responding: "[T]here was no dog." And he was right; there was no dog. Dr. Leo testified that when a confession matches the evidence, the confession is probably true, "absent contamination and the degree to which it's not likely guessed by chance."

In his statements to the detectives, defendant admitted to shooting the victim and he volunteered his motive for it. After Fry and Harris both continued to encourage defendant to tell his side of the story, defendant told them that he did not know why someone vandalized his car. He told them that his girlfriend saw who vandalized the car. He explained that he had suspected the victim had been the culprit. And although the detectives knew about the vandalism, they never mentioned it before defendant did.

Defendant volunteered how he got a gun from K, described finding the victim, approaching him, and confronting him about the victim's purported hostility towards defendant. Defendant further described the victim challenging defendant by saying "what you gonna do about it? You catch me slippin' you ain't doing nothing?" Defendant volunteered his thoughts about this challenge: "Ok I'll do, do my job. You know," and he shot the victim. Defendant then drove away, only to be spotted near the scene by Officer Kwan minutes later.

Perhaps the most telling evidence of the truth of defendant's confession is the two conversations defendant had with himself while alone in the interrogation room. While the detectives got defendant pizza, defendant said to himself, "Don't matter [unintelligible]. I'd rather be a man and step up to the plate than be a punk about it." At the end of the interrogation, after Harris thanked defendant for being truthful, defendant responded, "thank you." Then, immediately after the detectives left the room, defendant said to himself, "You know I'm doing right. At least I'm speaking . . . with the truth. Life is going to hurt."

Beyond defendant's confession and his two conversations with himself, the trial evidence established that defendant was the shooter and was largely consistent with defendant's confession. Officer Kwan, who was driving towards Tiffany and 12th Streets, spotted defendant in a vehicle matching the description of the vehicle seen leaving the scene close to that location within two to three minutes of the dispatch. After initially pulling over, defendant suddenly fled and led Kwan and other officers on a high-speed chase through the surface streets of Stockton, going through stop signs and red lights, driving on the wrong side of the road and reaching speeds of 80 miles per hour.

N.V. testified that she told the police that the shooter, while pointing the gun downward at the victim, said "Fuck you, cuz, that's for messing with my family," and a detective confirmed that she made that statement. A jury could reasonably infer this was a reference to what defendant suspected the victim had done to his brother's vehicle or the mean mugging confrontation the night before when defendant was with his girlfriend and his "stepson." N.V. viewed defendant in a showup, and, according to Rodriguez, she identified defendant as the person she saw at the scene of the shooting and identified defendant's car as the one she saw the shooter leave in immediately after the shooting. M.M. was also brought to the location of defendant's apprehension, and, according to Sandberg, while she could not identify the individual displayed in a showup, she said of defendant's vehicle, "that was the car."

We conclude that it is not reasonably probable that, had defendant's testimony about his perceptions of police officers in refugee camps been admitted, the jury would have reached a more favorable result. (*Watson*, *supra*, 46 Cal.2d at p. 836.)[16]

---

[16] Moreover, our conclusion would be the same even trial counsel had explained to the trial court in his offer of proof that defendant's response to the question about his refugee camp experience would have been similar to what he apparently told Dr. Lee – that "he perceived the camp guards as authoritative figures who were not to be questioned and with whom a refugee camp resident was not to disagree at the risk of being jailed, beaten

## II. Instruction to Consider Defendant's Unrecorded Statements with Caution and Impact on False Confession Defense Related to his Recorded Statements

### A. Additional Background and Defendant's Contentions

At the jury instruction conference, defense counsel asked the trial court whether it was required to give the last sentence of CALCRIM No. 358. That sentence is bracketed and states: "Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded." Defense counsel argued that the instruction suggests the recorded statements were "more believable."

The trial court observed that defendant's statement was recorded on video, and therefore, according to the court, "it's not a consider with caution situation." The court continued: "Except, we also have testimony by witnesses stating that the defendant made certain statements or -- well, they say that the shooter made statements." The court further stated: "By inference, that would be the defendant. Well, it says it's sua sponte." The court stated that the annotations to the instruction indicated that it is not required where a defendant's incriminating statements are written or tape recorded.[17] Defense counsel requested that the sentence be struck, arguing that "it gives the jury the wrong impression, that if it's recorded, it should just be accepted on face value." The prosecutor stated: "I think with the two different types of statements, some recorded and some not, I mean, I realize he doesn't want that and he wants it all to be treated equally, but I think that gives the impression that the witness statements of what they heard the shooter say might be given more credence." The court stated that it did not think the instruction

---

or disappeared; that he possessed the same perception and attitude toward authoritative figures, police officers in this case, as the residents at the refugee camp" – and defendant testified to that same effect. (See fn. 11, *ante*.)

[17] The bench note to which the trial court referred states, in part: "The bracketed cautionary instruction is not required when the defendant's incriminating statements are written or tape-recorded." (Use Note to CALCRIM No. 358.)

41

would be harmful to defendant. The court continued: "It only helps him. And the problem is there are statements that the jury could find that the defendant made, oral statements," "[a]nd that would -- clearly the last sentence would apply to that situation." The court elected to give the bracketed last sentence in instructing the jury with CALCRIM No. 358.

The trial court instructed the jury with CALCRIM No. 358 as follows: "You have heard evidence that the defendant made oral statements before the trial. You must decide whether the defendant made any of these statements in whole or in part. If you decide that the defendant made statements, consider the statements, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statements. [¶] *Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded*." (Italics added.)

Defendant asserts that the trial court erred in instructing the jury with the italicized language (the bracketed part of the instruction) because it implied that his recorded statements need not be subjected to scrutiny. According to defendant, that language gave undue weight to the statements defendant made in his recorded interrogation with the detectives. He emphasizes the essence of his defense was that his recorded statements in his interview with the detectives were false, psychologically induced, and not credible.

## B. Applicable General Principles of Law

" 'The trial court has the duty to instruct on general principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty "to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues." ' " (*People v. Alexander* (2010) 49 Cal.4th 846, 920-921 (*Alexander*).)

## C. Analysis

The purpose of the bracketed language in CALCRIM No. 358 is to aid the jury in evaluating whether the defendant actually made the statement. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1184 (*Diaz*).) "The cautionary instruction is concerned with the reliability and credibility of the witness who testifies about the defendant's statements." (*Id*. at p. 1187.) No such caution is necessary when the statements are recorded.

Prior to our high court's decision in *Diaz*, *supra*, 60 Cal.4th 1176, trial courts had a sua sponte duty to provide such cautionary language, first under statute, and following the repeal of the statute, based on case law. (*Id*. at pp. 1188-1190.) However, in *Diaz*, our high court concluded that, "[I]n light of a change in the law that requires the general instructions on witness credibility to be given sua sponte in every case, the cautionary instruction is not one of the general principles of law upon which a court is required to instruct the jury in the absence of a request." (*Id*. at p. 1189.) Thus, "the trial court is no longer required to give the instruction sua sponte." (*Id*. at pp. 1181, 1190.) As defendant notes, *Diaz* was decided on April 6, 2015, 14 days before the instruction conference in this case and 16 days before the day the trial court instructed the jury with CALCRIM No. 358. Therefore, as defendant correctly asserts, the trial court did not have a sua sponte duty to instruct the jury with the bracketed language in CALCRIM No. 358.

The bracketed language may be appropriately given if the subject inculpatory statements were oral and were not memorialized in a recording. Statements covered by the instruction include unrecorded admissions, preoffense and postoffense statements witnesses hear a defendant make, and statements constituting the crime as in *Diaz*, where the statements were oral criminal threats. (*Diaz*, *supra*, 60 Cal.4th at pp. 1181, 1185-1187.) However, the cautionary instruction *should not* be given " ' "[I]f the oral admission was tape-recorded and the tape recording was played for the jury." ' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1197 [discussing cautionary instruction set forth in

43

CALJIC 2.70[18]], quoting *People v. Williams* (2008) 43 Cal.4th 584, 639 [although not expressly stated in the opinion, the cautionary instruction was that set forth in CALJIC 2.70]; see *People v. Slaughter* (2002) 27 Cal.4th 1187, 1200 (*Slaughter*) [cautionary instruction in CALJIC 2.71[19] should not be given if the oral admission was tape-recorded and played for the jury].)  The court in *Diaz* recognized that, while "the instruction may be useful to the defense in highlighting for the jury the need for care and caution in evaluating evidence of the defendant's statements," "the defendant may not always want the instruction to be given." (*Diaz*, at p. 1189.)

Here, evidence pertaining to inculpatory statements attributed to defendant included both his recorded interview with Harris and Fry and a statement at the scene of the shooting, where the shooter reportedly stated:  "Fuck you, cuz, that's for messing with my family," or something similar.  Consequently, evidence concerning extrajudicial inculpatory statements potentially attributed to defendant included both recorded

---

[18] CALJIC No. 2.70 stated:  "A confession is a statement made by a defendant in which [he] [she] has acknowledged [his] [her] guilt of the crime[s] for which [he] [she] is on trial.  In order to constitute a confession, the statement must acknowledge participation in the crime[s] as well as the required [criminal intent] [state of mind].  [¶]  An admission is a statement made by [a] [the] defendant which does not by itself acknowledge [his] [her] guilt of the crime[s] for which the defendant is on trial, but which statement tends to prove [his] [her] guilt when considered with the rest of the evidence.  [¶]  You are the exclusive judges as to whether the defendant made a confession [or an admission], and if so, whether that statement is true in whole or in part.  [¶]  [*Evidence of [an oral confession] [or] [an oral admission] of the defendant not made in court should be viewed with caution*.]"  (Italics added.)

[19] CALJIC No. 2.71 provides:  "An admission is a statement made by [a] [the] defendant which does not by itself acknowledge [his] [her] guilt of the crime[s] for which the defendant is on trial, but which statement tends to prove [his] [her] guilt when considered with the rest of the evidence.  [¶]  You are the exclusive judges as to whether the defendant made an admission, and if so, whether that statement is true in whole or in part.  [¶]  [*Evidence of an oral admission of [a] [the] defendant not made in court should be viewed with caution*.]"  (Italics added.)

44

statements which were played for the jury and unrecorded statements reported by a witness. Thus, the cautionary instruction would have been properly given in relation to the unrecorded statements purportedly made by the shooter potentially attributable to defendant. However, defendant did not want the instruction and the trial court was not required to give it sua sponte. As the *Diaz* court observed, it "might not be in the defendant's interest" to give the cautionary instruction and "it is more appropriate to permit defendants to determine whether to request the instruction." (*Diaz, supra,* 60 Cal.4th at p. 1192.) The trial court erred in giving the cautionary bracketed language because the defense did not want it.

## D. Harmless Error

Given the false confession defense defendant mounted here, the instruction had the potential of " ' "confusing the jury." ' " (*Alexander*, *supra*, 49 Cal.4th at pp. 920-921.) However, we conclude that the error was harmless and did not prejudice defendant.

Defendant asserts that the erroneous provision of this instruction deprived him of a fair trial because it deprived him of his opportunity to present a defense and lightened the prosecution's burden of proof. Therefore, according to defendant, this error must be reviewed under the harmless beyond a reasonable doubt standard of *Chapman*, *supra*, 386 U.S. 18. We disagree. "Mere instructional error under state law regarding how the jury should consider evidence does not violate the United States Constitution." (*People v. Carpenter* (1997) 15 Cal.4th 312, 393, superseded by statute on other grounds as recognized in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106, citing *Estelle v. McGuire* (1991) 502 U.S. 62, 71-75 [116 L.Ed.2d 385, 398-401].) And as we have seen, defendant was not deprived of the opportunity to present a complete defense. (*Crane*, *supra*, 476 U.S. at p. 690.) Moreover, as the *Diaz* court noted, "[t]he language of the cautionary instruction [in CALCRIM No. 358] does not reference the People's burden of proof or the elements of the offense, or in any other way suggest to jurors that the instruction was meant to create an exception to the rule that all elements of the crime

45

must be proved beyond a reasonable doubt." (*Diaz, supra,* 60 Cal.4th at p. 1188.) The cautionary instruction, given under the circumstances of this case and considered in the context of the instructions as a whole and the trial record, did not " 'so infect[] the entire trial that the resulting conviction[s] violate[] due process.' " (*Estelle*, at p. 72, quoting *Cupp v. Naughten* (1973) 414 U.S. 145, 147 [38 L.Ed.2d 368, 373-374].) Accordingly, we review this claim of instructional error under the standard set forth in *Watson, supra,* 46 Cal.2d 818, and inquire whether it is reasonably probable that, but for the error, the jury would have reached a result more favorable to defendant. (*Id.* at pp. 835-836; see *Slaughter*, *supra*, 27 Cal.4th at p. 1201 [concluding that the error in instructing the jury to view defendant's tape-recorded admissions with caution was harmless because it was not reasonably probable the jury would have reached a result more favorable to defendant had the instruction not been given].)

Neither attorney commented on the instruction during closing argument; thus, no jury confusion resulted from anything they said. (See *Guiton, supra*, 4 Cal.4th at p. 1130 [prosecutor only "briefly argued" invalid prosecution theory in closing argument and instructing on invalid theory was harmless].) For the same reasons we concluded the error in precluding defendant's testimony concerning refugee camp police was harmless, and for the additional reason that neither attorney commented on the bracketed language of CALCRIM No. 358, we conclude the instructional error here is harmless. Again, we "focus[] not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration." (*Beltran*, *supra*, 56 Cal.4th at p. 956.) On this record, notwithstanding the evidence put on by defendant to the effect that the interview with the detectives was coercive and defendant was particularly vulnerable to coercive police interrogation tactics based on a variety of factors, we conclude it is not reasonably probable that, had the cautionary instruction not been given, the jury would have reached a result more favorable to defendant. (*Watson*, *supra*, 46 Cal.2d at pp. 835-836.)

46

### III. Denial of Evidence Code section 402 Hearing Regarding Gang Testimony

#### A. Additional Background and Defendant's Contentions

Because Slater's preliminary hearing testimony was considered by the trial court in ruling on defendant's in limine motion, we summarize it here.

Slater testified that he was assigned to the Stockton Police Department's Gang Suppression Unit, and that his primary assignment within the unit was Asian gangs in Stockton. He testified as a gang expert. Slater testified that Hmong Nation Society, or HNS, was a gang that identified with the color blue "as a Crip set here in Stockton." MOD, which stood for Masters of Destruction or Menace of Destruction, was another Asian gang in Stockton, and was a rival gang to HNS. MOD identified with the color red "as a Blood set . . . ." MOD also identified with the numerical symbol 301.

Asked about the primary activities of HNS, Slater testified: "I've conducted investigations of assault with a deadly weapon, attempted homicide, stolen vehicles, burglaries, weapons violations." With regard to HNS predicate offenses, Slater testified that Vue Xiong and Lue Vang were both HNS members who had been convicted, although he did not specifically testify at the preliminary hearing to the actual nature of those convictions.

Slater testified that he researched defendant's background and learned that, in 2006, he was contacted with two HNS members in a vehicle during a traffic stop. A loaded handgun was found hidden in the dash of the vehicle behind the CD player. Slater also testified that, while defendant was housed at an honor farm, he contacted an officer stating that he needed to be reassigned because he was having a problem with one or more MOD members housed at the honor farm.

Slater testified that it was his opinion that defendant was a member of HNS. Slater acknowledged in his preliminary hearing testimony that he was not one of the officers who investigated the shooting of the victim here and further acknowledged that

47

he was basing his opinion on "the crime reports" as well as "the classification interviews and the incident at the Honor Farm."

Slater testified that he observed photographs of the victim and saw that he had "MOD" tattooed on his back. At the time he was shot, he was wearing a red shirt and a red baseball cap. Slater opined that the victim was a MOD member.

Slater testified that it was his opinion that defendant committed the charged crimes to promote, further, or assist a criminal street gang and that this was a gang shooting. When asked why, Slater responded: "Because you have two rival gangs. One member felt disrespected, confronted a rival gang member who's dressed all in red at the time, either it be for vandalizing his vehicle or a mean mugging incident. Confronts him. Makes the statement that witnesses heard 'Fuck you cuzz, this is for fucking with my family.' And then winds up shooting and fatally wounding [the victim], who was dressed in all red." Slater testified that, in his experience, the term "cuzz" can be used either as a greeting between Crip gang members or as a derogatory or confrontational term when directed from a Crip to a Blood. Slater testified that, when asked if he had a gang affiliation, defendant responded that a relative was HNS. When asked if he knew whether the victim was a gang member, defendant responded: "[H]e was wearing red, correct," or "red, right." Slater further testified that the shooting was about respect, which, according to Slater, carries a great deal of weight with gangs. He testified that a gang member "mean mugging" a rival gang member would be a sign of disrespect. He continued: "[T]here was someone else in the vehicle with [defendant]. The officers that were in a pursuit, witnesses at the scene stated there was another subject in the vehicle. If this person, this unknown person, was another HNS gang member and [defendant] did not act when seeing a rival gang member, there could be ramifications within his own gang if he does not act." Slater also testified at the preliminary hearing that defendant stated in his classification the day after the shooting that he was "an inactive HNS gang member," which caused Slater to believe defendant had an association with HNS.

48

In his in limine motions, defendant, relying on, among other things, Evidence Code 402, moved to have Slater's testimony excluded until a proper foundation had been established. In a subsequent in limine motion, defendant sought to restrict Slater's testimony on several grounds. Among other grounds, defendant relied on reliability, foundation, and asserted that much of the information on which Slater relied constituted testimonial hearsay in violation of his confrontation clause rights and *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*). Defendant specifically anticipated that the prosecution would "argue that any hearsay from the prosecution gang expert will be offered as the basis of opinion and not for the truth of the matter asserted." Defendant urged the court to reject this argument, insisting that such testimony would be offered for its truth. Defendant objected to the anticipated expert opinion testimony that would not be based on personal knowledge and observations, but on the out-of-court statements of others, including statements from other law enforcement officers and statements in police reports.

The defense requested an Evidence Code 402 hearing on the subject of Slater's gang testimony. Trial counsel asserted that there was information to be gleaned from Slater which had not come out in his preliminary hearing testimony. Among other things, counsel emphasized the instance wherein Slater stated that defendant was in a vehicle with gang members and a gun was discovered in the dashboard. Counsel stated that the defense had not been provided with police reports related to that incident prior to the preliminary hearing. He asserted that, if the individual who possessed the car was the only person responsible for the gun, Slater should not be able to rely on that incident in concluding that defendant had ties to a gang. Thus, counsel asserted that he should have the opportunity to examine Slater on the subject.

Trial counsel also asserted that any remark by defendant while in custody that a gang member had a problem with him does not necessarily mean defendant was a gang

49

member. Counsel also questioned whether defendant's classification interview actually indicated any gang connection.

Trial counsel asserted that "what Detective Slater is relying upon is insufficient for his opinion that [defendant] is associated or affiliated with a gang and that this particular crime was committed pursuant to 186.22(b)."

The trial court concluded, based on the transcript of the preliminary hearing testimony, that there was "ample evidence for Officer Slater to make that opinion." The court relied on Slater's testimony that defendant was heard to say, "Fuck you, cuz, that's for fucking with my family." The court noted that the term "cuz" can be a greeting between Crip members, and can also be a derogatory or confrontational term when used by a Crip gang member addressing a Blood gang member. The trial court also stated defendant had indicated a relative was an HNS gang member. The trial court also relied on defendant's response, when asked whether the victim was a gang member, that "He was wearing red, correct." Additionally, the trial court noted that the victim had been wearing red at the time of the shooting, and that he "clearly was a gang member." There was no dispute that the victim, who had the gang name tattooed on his back, was a gang member. The trial court concluded that Slater's testimony "did have sufficient reasons to go to a jury."

The trial court continued: "So I don't think it's necessary to have a[n Evidence Code section] 402 hearing. I agree it's discretionary, but having looked at the testimony of [Detective Slater], I don't think you need it." The court clarified that the defense could call witnesses to challenge Slater's testimony. According to the court, such evidence would address the weight of the evidence, not its admissibility.

For the most part, Slater's trial testimony mirrored his testimony at the preliminary hearing. The trial court instructed the jury with CALCRIM No. 1403, as follows: "You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove the

50

gang-related enhancements charged, or that the defendant had a motive to commit the crimes charged. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his opinion. [¶] You may not consider this evidence for any other purpose. *You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime*." (Italics added.)

Defendant asserts that the trial court erred in declining the defense request for an Evidence Code section 402 hearing and in ruling that Slater could testify that defendant was a gang member and that the shooting was gang-related. According to defendant, Slater's opinions lacked an adequate factual foundation, and were based instead on speculation and conjecture. He also asserts that Slater's opinion that he was a gang member and that the shooting was gang-related was based on testimonial hearsay. Defendant acknowledges that the jury did not find the gang enhancement allegations to be true, but asserts that Slater's testimony prejudiced him with regard to counts 1 and 2 because it connected defendant to a criminal street gang and would lead jurors to believe defendant had a motive to commit the charged homicide, and therefore, he must have done so.

In his reply brief, defendant cites our high court's decision in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), which was decided after his opening brief and the respondent's brief were filed.[20] Defendant argues *Sanchez*, which we discuss *post*,

---

[20] " 'As a matter of normal judicial operation, even a non-retroactive decision [i.e., one that cannot serve as a basis for collateral attack on a final judgment] ordinarily governs all cases still pending on direct review when the decision is rendered.' " (*People v. Guerra* (1984) 37 Cal.3d 385, 400; see also *In re Richardson* (2011) 196 Cal.App.4th 647, 663.) Because this case was pending on direct review at the time *Sanchez* was decided, this case is governed by *Sanchez*. The Attorney General did not request supplemental briefing to address *Sanchez*.

51

"moots respondent's argument that Slater's testimony was admissible." He asserts that the bases for Slater's testimony constituted hearsay, much of which was testimonial hearsay and which should not have been admitted at trial.

## B.  Standard of Review and Applicable General Principles of Law

"In determining the admissibility of evidence, the trial court has broad discretion." (*People v. Williams* (1997) 16 Cal.4th 153, 196 (*Williams*).)  The decision to hold an Evidence Code section 402 hearing is within the trial court's discretion.  (Evid. Code, § 402, subd. (b) [with exceptions not relevant here, the court *may* determine the admissibility of evidence out of the presence or hearing of the jury]; *Williams*, at pp. 196-197.)  "A trial court's ruling on admissibility implies whatever finding of fact is prerequisite thereto; a separate or formal finding is, with exceptions not applicable here, unnecessary." (*Williams*, at p. 196, citing Evid. Code, § 402, subd. (c).)  "On appeal, a trial court's decision to admit or not admit evidence, whether made *in limine* or following a hearing pursuant to Evidence Code section 402, is reviewed only for abuse of discretion." (*Williams*, at p. 197.)

For a defendant to be subject to an enhancement pursuant to section 186.22, subdivision (b)(1), where the crime involves a criminal street gang, " 'the prosecution must prove that the crime for which the defendant was convicted had been "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." [Citation.]  In addition, the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a "pattern of criminal gang activity" by committing, attempting to commit, or soliciting *two or more* of the enumerated offenses (the so-called "predicate offenses") during the statutorily defined period.' "

52

(*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047; see § 186.22, subd. (b)(1).) "Accordingly, when the prosecution charges the criminal street gang enhancement, it will often present evidence that would be inadmissible in a trial limited to the charged offense." (*Hernandez*, at p. 1044.) However, the *Hernandez* court also observed that "evidence of gang membership is often relevant to, and admissible regarding, the charged offense." (*Id.* at p. 1049.) The court continued: "[e]vidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Ibid.*)

## C. Denial of Defendant's Request for an Evidence Code section 402 Hearing

We conclude that the trial court did not abuse its discretion in denying defendant's request for an Evidence Code section 402 hearing regarding Slater's proffered testimony. The decision as to whether to hold such a hearing was well within the trial court's discretion. (Evid. Code, § 402, subd. (b); *Williams*, *supra*, 16 Cal.4th at pp. 196-197.) The facts upon which Slater relied for his opinions at trial were essentially the same as those offered at the preliminary hearing. The trial court reviewed Slater's preliminary hearing testimony in making its determination that Slater could testify at trial concerning his opinions that defendant was a member of HNS and that the shooting was gang-related. On this record, we conclude that the trial court did not abuse its discretion in denying defendant's request for an Evidence Code section 402 hearing.

## D. *Sanchez*

While this appeal was pending, our high court decided *Sanchez, supra*, 63 Cal.4th 665. In *Sanchez,* our high court considered "the degree to which the *Crawford* rule limits an expert witness from relating case-specific hearsay content in explaining the basis for his opinion," and held that "case-specific statements related by the prosecution expert concerning defendant's gang membership constituted inadmissible hearsay under

53

California law." (*Sanchez*, at p. 670.) The *Sanchez* court further held that "[s]ome of those hearsay statements were also testimonial and therefore should have been excluded under *Crawford*." (*Sanchez*, at pp. 670-671.) Our high court "adopt[ed] the following rule: When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Id*. at p. 686, fn. omitted.)

The *Sanchez* court identified a two-step inquiry to address such basis testimony in criminal cases. "The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term." (*Sanchez, supra*, 63 Cal.4th at p. 680.)

The United States Supreme Court has not provided a clear definition of "testimonial." (E.g., *People v. Leon* (2015) 61 Cal.4th 569, 603.) However, our high court has "discerned two requirements. First, 'the out-of-court statement must have been made with some degree of formality or solemnity.' [Citation.] Second, the primary purpose of the statement must 'pertain[] in some fashion to a criminal prosecution.' " (*Ibid*.; accord, *People v. Dungo* (2012) 55 Cal.4th 608, 619 [referring to the formality and primary purpose criteria as "critical components" instead of "requirements"].) "When the People offer statements about a completed crime, made to an investigating officer by a

nontestifying witness, *Crawford* teaches those hearsay statements are generally testimonial unless they are made in the context of an ongoing emergency . . . , or for some primary purpose other than preserving facts for use at trial." (*Sanchez*, *supra*, 63 Cal.4th at pp. 694-695.) Formal police reports may be made with the requisite degree of formality or solemnity. (*Ibid.*)

According to our high court, its opinion in *Sanchez* "restore[d] the traditional distinction between an expert's testimony regarding *background information* and *case-specific facts*." (*Sanchez, supra*, 63 Cal.4th at p. 685, italics added.) The court distinguished between an expert's testimony concerning his or her general knowledge which, even if technically hearsay, is not subject to exclusion on hearsay grounds on one hand, and, on the other, what it denominated "*case-specific* facts about which the expert has no independent knowledge." (*Id.* at p. 676.) "Case-specific facts are those relating to the *particular events and participants alleged to have been involved in the case being tried*." (*Ibid.*, italics added.)

In adopting these rules, the *Sanchez* court disapproved of its pre-*Crawford* decisions which held that the matters upon which an expert relied as the bases of the expert's opinion were not offered for their truth, and rejected the notion that a limiting instruction coupled with an Evidence Code section 352 balancing analysis was sufficient to allay hearsay and confrontation clause concerns. (*Sanchez, supra*, 63 Cal.4th at p. 686, fn. 13.) The court specifically disapproved of *People v. Gardeley* (1996) 14 Cal.4th 605, disapproved by *Sanchez*, at page 686, footnote 13, to the extent that it suggested that an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules. (*Sanchez*, at p. 686, fn. 13.)

### E. Hearsay in the Gang Expert's Testimony

The People assert that defendant has forfeited his contention. We disagree. Because defendant timely objected to the admission of Slater's testimony by in limine

55

motion raising both hearsay and Sixth Amendment confrontation clause claims, defendant did not forfeit his contention.

Once the confrontation clause objection was made, the prosecution, "as the proponent of evidence presumptively barred by the hearsay rule and the Confrontation Clause," bore the burden of establishing the admissibility of the subject evidence by, inter alia, establishing that it was not testimonial hearsay. (*Idaho v. Wright* (1990) 497 U.S. 805, 816 [111 L.Ed.2d 638, 652-653]; see *United States v. Jackson* (5th Cir. 2011) 636 F.3d 687, 695 [the government bears the burden of defeating the defendant's properly raised confrontation clause objection by establishing that its evidence is nontestimonial]; *People v. Livaditis* (1992) 2 Cal.4th 759, 778 [the proponent of hearsay has to alert the court to the exception relied upon and has the burden of laying the proper foundation; under Evidence Code sections 403 and 405, if a hearsay objection is properly made, the burden shifts to the party offering the hearsay to lay a proper foundation for its admissibility under an exception to the hearsay rule]; cf. *People v. Ochoa* (2017) 7 Cal.App.5th 575, 584-585 [recognizing the prosecution's burden as the proponent of the evidence, but concluding defendant failed to make the objection triggering that burden].)

The parties essentially agree that in his trial testimony, Slater relied on the following in concluding that defendant was a member of HNS, and that his shooting of the victim was gang-related: (1) the 2006 traffic stop in which defendant was found to be in the company of an HNS member and an HNS associate, and a gun was found hidden in the car; (2) defendant's 2009 statement to an officer at the honor farm, indicating that he needed to be reassigned to different housing because he might have a problem with an MOD member in the same housing unit; (3) defendant's 2011 booking statements, denying gang affiliation; and (4) circumstances involved in the charged homicide, including the victim's red clothing, defendant's observation that the victim was wearing red clothing, the fact that the victim had a MOD tattoo, defendant's reference to the victim acknowledging that he had been caught "slippin'," the statement attributed to the

56

shooter, in which he stated, "[f]uck you, cuz, that's for fucking with my family," and (5) defendant's booking statement.

We conclude that the 2006 traffic stop, defendant's 2009 statement at the honor farm requesting housing reassignment, defendant's 2011 booking statement denying gang affiliation, and defendant's booking statement made after his arrest on the instant charges all involved case-specific hearsay. Slater's testimony was based on his review of reports and he relied on the truth of these reports in using the information as the bases for his opinion. Defendant's own statements could be regarded as admissions (Evid. Code, § 1220), but they came to the jury through a second layer of hearsay. "[M]ultiple hearsay is admissible for its truth only if each hearsay layer separately meets the requirements of a hearsay exception." (*People v. Arias* (1996) 13 Cal.4th 92, 149; Evid. Code, § 1201.) Since the information as to each of these events involved defendant, it was case-specific. (*Sanchez, supra*, 63 Cal.4th at p. 676 [case-specific facts relate to participant alleged to have been involved in the case being tried].)

Regarding the confrontation clause, the 2006 traffic stop qualifies as testimonial. There was no showing that the hearsay statements were made in the context of an ongoing emergency. Rather, the report was clearly made for the purpose of preserving facts for a subsequent prosecution. There was no showing of unavailability of the law enforcement officer or officers who could have testified as to this event on a non-hearsay basis, and there is no showing that defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing. (See *Sanchez, supra*, 63 Cal.4th at p. 686.)

In contrast, there is no indication defendant's 2009 statement at the honor farm, and his 2011 and current statements made to booking officers, were made for purposes of preserving facts for a prosecution. Rather, it seems clear that the primary purpose of those statements was for jail administrative purposes and defendant's personal safety. (See *People v. Leon* (2016) 243 Cal.App.4th 1003, 1020 [purpose of jail classification

57

questions was not to create and out-of-court substitute for trial testimony or to otherwise contribute to a criminal investigation or prosecution; rather "the *primary* purpose for the gang affiliation questions was to further institutional security objectives, i.e., to ensure the safety of inmates and jail personnel"].) We cannot conclude those statements were testimonial.

As for the evidence related to the charged offenses upon which Slater relied in forming his opinion, no hearsay or confrontation clause objection is cognizable. These facts were all related to evidence properly before the jury. Slater merely testified concerning his expert opinion as to the meaning of this evidence in the context of this case. (See generally Evid. Code, §§ 801, 802, 804.)

## F. Prejudice

The erroneous admission of hearsay evidence under state law is reviewed for prejudice under the standard articulated in *Watson, supra*, 46 Cal.2d 818. (*People v. Duarte* (2000) 24 Cal.4th 603, 618-619.) As for the testimonial hearsay concerning the 2006 traffic stop, the admission of which violated *Crawford* and defendant's right to confrontation, prejudice must be gauged under *Chapman*, *supra*, 386 U.S. at pages 23-24. (See *Sanchez, supra*, 63 Cal.4th at pp. 698-699 [applying the harmless beyond a reasonable doubt standard to error in admitting case-specific testimonial hearsay which violated defendant's right to confrontation].)

Because the jury did not reach a finding on the section 186.22 gang enhancement allegations, and the trial court granted the prosecution's motion to strike those allegations, we need not address them here. However, defendant asserts that the improper introduction of the gang evidence rendered it more likely the jury would discount his testimony that his admissions were false, and therefore it was more likely the jury would find him guilty of first degree murder rather than a lesser degree of homicide.

Without the improperly admitted case-specific hearsay and testimonial hearsay, the evidence properly before the jury we have already summarized overwhelmingly

58

established defendant's guilt. On this record, under any standard, had the jury not heard the evidence improperly admitted through Slater, it nonetheless would have concluded on the evidence properly before it that defendant shot and killed the victim and was guilty of first degree murder.

Defendant asserts that the gang evidence contaminated the trial and made defendant out to be a member of a homicidal gang. However, Slater's testimony was not nearly as inflammatory as the facts of this case. (Cf. *People v. Eubanks* (2011) 53 Cal.4th 110, 144, [the potential for Evid. Code, § 352 prejudice is decreased when testimony describing the defendant's uncharged acts is no stronger and no more inflammatory than the testimony concerning the charged offenses].)

To the extent the improperly admitted gang evidence could be interpreted as implying that defendant had a criminal disposition, as stated *ante*, the trial court instructed the jury with CALCRIM No. 1403 on the proper uses for the subject evidence, and specifically that the jury "may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."[21] "The jurors are

---

[21] To the extent that defendant faults the trial court for instructing the jury with CALCRIM No. 1403 on the ground that it "suggested the jury could discredit [defendant's] testimony because he was a gang member," he neither objected to the proposed instruction at the conference on jury instructions nor when the court gave the instruction. Therefore, he forfeited any contention that this instruction was improper. (*People v. McPheeters* (2013) 218 Cal.App.4th 124, 131-132 [generally, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court].) As to defendant's blanket statement that if counsel forfeited any contention, he was deprived of the constitutionally effective assistance of counsel, it did not constitute ineffectiveness for counsel to fail to object to an instruction that was correct on the law and which was supported by the evidence presented at trial. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1170 [CALCRIM No. 1403 correctly states the law and the evidence justified inclusion of the optional motive and witness credibility paragraphs; because there was no error in giving the instruction, any objection would have been overruled, there is no reasonable probability that an objection would have led to a different result, and the defendant failed to establish

59

presumed to understand, follow, and apply the instructions to the facts of the case before them." (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1229, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

We also note that the jury deadlocked on the gang enhancement allegations, suggesting that "the jury did not accept the gang evidence . . . uncritically." (*People v. Williams* (2009) 170 Cal.App.4th 587, 613 [jury acquitted defendant of possession of methamphetamine for sale and found him guilty of only simple possession and found not true a gang enhancement allegation].) Indeed, this "strongly indicates that the gang evidence was not unduly prejudicial . . . ." (*People v. Garcia* (2008) 168 Cal.App.4th 261, 278 [jury's acquittal of a codefendant of murder strongly indicates that the gang evidence was not unduly prejudicial].)

Defendant seems to suggest that Slater's testimony concerning the primary activities and predicate offenses of HNS were prejudicial. However, this evidence was not case-specific hearsay, nor did its admission violate the confrontation clause. The predicate offenses were chapters in the biography of the gang and thus were historical background information upon which an expert is entitled to rely and discuss. (*People v. Bermudez* (2019) 40 Cal.App.5th 412, 416, 429, 430, rehg. granted Oct. 25, 2019; *People v. Meraz* (2018) 30 Cal.App.5th 768, 781, review granted March 27, 2019, S253629; *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 411.) Defendant asserts no objection to the predicate offense testimony on appeal other than hearsay and confrontation clause.

Defendant asserts that he was prejudiced by Slater's improper testimony "even if the jury would have concluded without Slater's testimony that [defendant] shot the victim, because the degree of the homicide was in question, and there was evidence that [defendant] was on drugs and felt provoked, which was relevant to the issue of

---

that counsel's failure to object to CALCRIM No. 1403 constituted ineffective assistance of counsel].)

deliberation and premeditation." As defendant notes, the jury was instructed on murder in the first and second degrees, and also with voluntary manslaughter based on sudden quarrel or heat of passion.[22]

We do not see how the objectionable evidence at issue here impacted the determination of defendant's mens rea. None of it was of a nature that would provide an inference that defendant committed the homicide with deliberation and premeditation as opposed to some other culpable mental state.

Moreover, as set forth more fully *ante*, the evidence properly before the jury, much of which was from defendant's own statements, established that defendant

---

[22] The trial court instructed the jury with CALCRIM No. 570 as follows: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] One, the defendant was provoked. [¶] Two, as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment. [¶] And, three, the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. It is not enough that the defendant simply was provoked. [¶] The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment. [¶] If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

61

voluntarily sought a confrontation with the victim because the victim had disrespected him just the day before. Defendant obtained a gun in preparation for that confrontation and looked for the victim, whom he suspected of having vandalized his brother's car and who mean mugged him the previous night. Upon finding the victim, defendant exited his car and approached him and, when disrespected by the victim's verbal challenge, he "d[id] [his] job" and shot the victim six times, one time in the back. N.V. testified she saw the shooter "looking like that they were looking down at somebody," extending his arm downward like he was pointing a gun at someone. She heard the shooter say, "Fuck you, cuz, that's for messing with my family." And then she heard "another bang," and then the shooter jumped into the driver's side of a car situated nearby. The autopsy revealed a graze wound to the victim's head, which was inflicted while the victim's head was near concrete, and this appears to be consistent with the last shot N.V. heard. As defendant mused to himself during one of the times the detectives left the interrogation room, "I'd rather be a man and step up to the plate than be a punk about it." This evidence clearly supported a finding of deliberation and premeditation.

Nor would the absence of the inadmissible evidence result in a voluntary manslaughter conviction instead of first degree murder. The provocation suggested by defendant through his statements to the detectives included the fact that his car had been vandalized a couple of months earlier, the disrespect the victim showed defendant the night before the shooting, defendant seeing the victim the day of the shooting outside of his girlfriend's house looking at defendant's car and looking at his girlfriend's house, and the disrespect the victim showed defendant when defendant confronted him. We conclude this was not provocation which "would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." (CALCRIM No. 570.) Objectively, the victim's conduct here cannot be deemed "sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Enraca* (2012) 53

62

Cal.4th 735, 759.) The evidence suggested a gang provocation that supplied a motive to kill, not voluntary manslaughter provocation. "The defendant is not allowed to set up his own standard of conduct." (CALCRIM No. 570.) "The standard is not the reaction of a 'reasonable gang member.' " (*Enraca*, at p. 759.)

Thus, we conclude that the erroneous admission of portions of Slater's testimony described herein was harmless under any standard. (*Chapman, supra,* 386 U.S. at p. 24 [the error is harmless beyond a reasonable doubt]; *Watson, supra,* 46 Cal.2d at p. 836 [it is not reasonably probable that defendant would have obtained a more favorable result in the absence of the error].)

## IV. *Elizalde* Claim

### A. Additional Background and Defendant's Contentions

Prior to the commencement of the jury trial, as the trial court denied defendant's request for an Evidence Code section 402 hearing on Slater's gang testimony, the trial court stated: "As far as the statement made to the booking officer, [*People v. Gomez* (2011) 192 Cal.App.4th 609, disapproved in part by *Elizalde, supra*, 61 Cal.4th 523] . . . says that 'Statements made during the booking process regarding gang affiliations are admissible under the booking question exception to [*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*)].' "

During his trial testimony, Slater testified that, in 2011, defendant was booked into county jail, and, during a classification interview, defendant denied any gang affiliation. After he was arrested in this case, when defendant underwent a classification interview, he stated that "he was an inactive HNS gang member."

Defendant testified that he did not tell a classification officer or anyone else that he was an inactive HNS member. He believed that he told the officer that he used to have a relative that was part of HNS.

Defendant asserts that the trial court prejudicially erred in permitting Slater to testify regarding defendant's booking statements about his gang affiliation. Defendant

63

asserts that, under *Elizalde*, this was clear error. Although *Elizalde* was decided after defendant's trial, defendant asserts that it applies to his case because his appeal was not yet final at the time *Elizalde* was decided. He asserts that his contention was not forfeited, and that, in the alternative, if it was forfeited, his trial counsel was constitutionally ineffective.

In his reply brief, defendant asserts that whether or not the admission of his booking statements violated *Elizalde*, the issue is moot based on *Sanchez, supra*, 63 Cal.4th 665. Defendant asserts that, under *Sanchez*, it was not permissible for Slater to testify concerning the booking statements because Slater's testimony in this regard constituted case-specific hearsay.

## B. *Elizalde*

"In *Elizalde, supra*, 61 Cal.4th 523, our Supreme Court held routine gang affiliation questions asked during the process of booking the defendant into jail amounted to 'interrogation' for purposes of triggering his rights under *Miranda*[, *supra*, 384 U.S. 436] . . . because such questions were 'reasonably likely to elicit an incriminating response' in light of California's 'comprehensive scheme of penal statutes aimed at eradicating criminal activity by street gangs,' and therefore, the defendant's un-*Mirandized* responses to such questioning were inadmissible against him during the prosecution's case-in-chief." (*People v. Lara* (2017) 9 Cal.App.5th 296, 335; see *People v. Villa-Gomez* (2017) 9 Cal.App.5th 527, 536-537.)

## C. Analysis

The People assert that defendant forfeited this contention on the ground that it is the burden of the appellant to affirmatively demonstrate error (*People v. Gamache* (2010) 48 Cal.4th 347, 378), and defendant failed to provide a record on appeal sufficient to establish whether he was properly advised pursuant to *Miranda* before making his 2011

64

booking statement.[23]  The People also assert that defendant's contention was forfeited in the trial court because no objection was offered on the ground that the use of his 2011 booking statement violated *Miranda*.  The People further assert that defendant cannot establish that he was denied the constitutionally effective assistance of counsel because he cannot establish that his attorney's performance fell below an objective standard of reasonableness under prevailing professional norms or resulting prejudice.  (See *Strickland*, *supra*, 466 U.S. 668.)

Ultimately, we need not resolve these questions.  We agree with defendant that, regardless of whether defendant can establish *Miranda*/*Elizalde* violations on this record, and related issues of preservation and forfeiture, the issue has been rendered moot by our determination *ante*, that the admission of these booking statements was improper under *Sanchez*.  Moreover, we have determined that defendant was not prejudiced by the error in the admission of this evidence, and need not address the matter further here.

## V.  *Pitchess* Review

### A.  Additional Background

#### 1.  The *Pitchess* Motion

Prior to trial, defendant filed a *Pitchess* motion seeking review of the personnel files for Harris, Fry, and Officer Gregory Dunn.[24]  Defendant asserted that the

---

[23]  As to defendant's booking statement made in connection with his booking for the instant case, the People assert that defendant "received a *Miranda* advisement while being interrogated prior to being booked.  Readvisement was unnecessary since the booking was reasonably contemporaneous with the prior knowing and intelligent waiver."  For the reasons we explain, we need not determine whether the People are correct in this contention, or whether the record is sufficient to establish as much.

[24]  Defendant's motion sought materials relating to the following:  lack of credibility; excessive force; hostility or aggression; prior wrongful acts involving moral turpitude including allegations of planting evidence, fabrication of police reports and probable cause, false testimony, and perjury; dishonesty, untruthfulness, veracity, false arrest, conduct unbecoming an officer, neglect of duty; false or misleading statements made

information discovered pursuant to his *Pitchess* motion could be relevant to his claim that the interrogation conducted by Harris and Fry was coercive and those detectives had previously engaged in a pattern and practice of using coercive and misleading interrogation tactics to solicit confessions. He further asserted that the results of the *Pitchess* motion as to Dunn could be relevant to his claim that Dunn illegally commanded his canine to attack defendant. Defendant claimed that obtaining materials from the officers' files was the only way to effectively impeach their credibility. Trial counsel stated in his supporting declaration that the defense would be that defendant was not involved in the shooting, that his confession was false and "the product of coercive interrogation techniques" by Harris and Fry, that an expert would "testify concerning the coercive nature of the interrogation," that depending on the outcome of the *Pitchess* motion, Harris and Fry had previously engaged in a pattern and practice of using coercive and misleading interrogation tactics to solicit confessions, that Dunn illegally commanded his canine to attack defendant for the purpose of inflicting unnecessary and unjustified pain on defendant, and that Harris and Fry used the encounter with the canine to "make veiled threats to coerce" defendant into giving a false confession. Real party in interest City of Stockton opposed the motion.

The trial court heard argument on defendant's *Pitchess* motion. The court noted the information could be relevant to the issue of voluntariness as to any statements, but also stated, "I'm not saying it's going to come in at trial." The trial court stated that the fact that defendant alleged that Dunn used excessive force, by use of his canine, would warrant review for acts of excessive violence, and the inconsistency in his report would warrant review for honesty and veracity. The trial court further determined that there was evidence that Harris made untrue statements, warranting review of his file for issues of

during questioning and/or interrogation of victims, witnesses and/or suspects; racial discrimination.

66

honesty and veracity.  As to Fry, the trial court stated that there was enough evidence of threats to warrant review for acts of excessive violence.

Thereafter, the trial court conducted the in camera hearing and, upon resuming proceedings in open court, stated:  "I have ordered some material," by which it indicated that it was ordering certain materials to be disclosed to the defense.  The trial court ordered the records returned to the city attorney with the direction that the materials be maintained to preserve them for appellate review.  The trial court also issued a protective order.

Defendant requests us to review the sealed transcripts of the in camera hearing to determine if the trial court followed proper procedure and released all relevant *Pitchess* materials.  Defendant further requests that we determine whether the trial court reviewed the relevant files for any evidence subject to disclosure under *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215] (*Brady*).

## 2.  Trial Evidence Concerning the Circumstances of Defendant's Arrest

Kwan testified that after he collided with defendant's vehicle, Kwan exited his vehicle, pointed his gun at defendant and ordered him to put his hands up and step out of the car.  Defendant got out and Kwan ordered him to the ground.  Defendant got down, but, when Kwan attempted to grab his arm to handcuff him, defendant tensed up.  Defendant was not really complying with Kwan's directions.  Kwan tried to get the defendant's right arm behind his back.

Officer Emiliano Rincon testified that he saw defendant struggling with the officers.  Rincon characterized the scene as defendant "on the ground and his body moving around and struggling and the officers yelling commands. . . .  [I]t was not a cooperative person being taken into custody."

Officer Gregory Dunn testified that when he arrived on the scene, he saw officers struggling with defendant.  Dunn testified that he could see that defendant was fighting with Kwan and other officers to get away.  According to Dunn, defendant was trying to

67

get his knees under him and push up. Dunn could not see defendant's hands. Dunn heard officers telling defendant to stop resisting. Dunn commanded his canine to apprehend defendant. The dog grabbed defendant on the upper thigh and then "grabbed onto [defendant's] buttocks." At some point, defendant attempted to push the dog away. According to Dunn, that presented officers with the opportunity to secure defendant's hand which he had been hiding. Kwan managed to handcuff defendant.

Kwan, however, testified that at the time the canine bit defendant, Kwan had not "had any problems with [defendant] other than stiffening up his arm." Kwan did not recall whether defendant attempted to hide his arms, stuck them between his legs, tried to roll away from officers, or pushed himself up to his knees to try to get free.

### B. *Pitchess* Principles

Our courts entertain "what have become known as *Pitchess* motions, screening law enforcement personnel files in camera for evidence that may be relevant to a criminal defendant's defense." (*People v. Mooc* (2001) 26 Cal.4th 1216, 1225, fn. omitted (*Mooc*); see *Pitchess*, *supra*, 11 Cal.3d 531.) To balance the defendant's right to discovery of records pertinent to his or her defense with the peace officer's reasonable expectation that his or her personnel records will remain confidential, the Legislature has adopted a statutory scheme requiring a defendant to meet certain prerequisites before his or her request may be considered. (See §§ 832.5, 832.7 & 832.8; Evid. Code, §§ 1043-1047.) A defendant seeking discovery of a peace officer's confidential personnel record must file a written motion describing the type of records or information sought (Evid. Code, § 1043, subds. (a), (b)(2)), and include with the motion an affidavit demonstrating "good cause" for the discovery and the materiality of such evidence relative to the defense. (Evid. Code, § 1043, subd. (b)(3); *Mooc*, *supra*, 26 Cal.4th at p. 1226.)

"If the trial court concludes the defendant has fulfilled these prerequisites and made a showing of good cause, the custodian of records should bring to court all documents '*potentially* relevant' to the defendant's motion. [Citation.] The trial court

68

'shall examine the information in chambers' [citation], 'out of the presence and hearing of all persons except the person authorized [to possess the records] and such other persons [the custodian of records] is willing to have present' [citations]. Subject to statutory exceptions and limitations, discussed below, the trial court should then disclose to the defendant 'such information [that] is relevant to the subject matter involved in the pending litigation.' " (*Mooc, supra*, 26 Cal.4th at p. 1226, italics added.)

"A trial court's ruling on a motion for access to law enforcement personnel records is subject to review for abuse of discretion." (*People v. Hughes* (2002) 27 Cal.4th 287, 330.)

## C. The In Camera *Pitchess* Hearing

We granted defendant's motion to augment the record to include, among other things, the proceedings in open court at which the trial court ruled on defendant's *Pitchess* motion, and the sealed transcript of the in camera *Pitchess* proceedings. Subsequently, on our own motion, we augmented the record to include the material presented to the trial court for its consideration in connection with defendant's *Pitchess* motion.

We have reviewed the transcript of the in camera hearing. Present were the trial court, the court reporter, Marci Arredondo, Stockton Deputy City Attorney, and Valerie Dunphy, the custodian of records for the Stockton Police Department. The custodian brought files with her, but the trial court failed to administer the oath to either the custodian or the deputy city attorney before it questioned them and heard answers concerning the files.

## D. Analysis

The trial court must administer the oath to whomever brings the personnel records and provides information about the records and the agency search for all records potentially relevant. (*Mooc, supra*, 26 Cal.4th at p. 1229, fn. 4 [criminal defendants are protected by the fact that a representative of the custodian of records is placed under oath

69

before responding to a trial court's questions during the in camera inspection of records]; *People v. White* (2011) 191 Cal.App.4th 1333, 1335, 1340-1341 (*White*).) "[A]dministering the oath to the custodians of records who testify at *Pitchess* hearings is necessary to establish the accuracy and veracity of the custodians' representations regarding the completeness of the record submitted for the court's review. [Citation.] The integrity of the custodian's testimony in this regard is also necessary to ensure that 'the locus of decisionmaking' at the hearing 'is to be the trial court, not the prosecution or the custodian of records.' " (*White*, at p. 1340, quoting *Mooc*, at pp. 1229-1230 & fn. 4.)

Furthermore, the trial court did not expressly ask whether the documents the custodian produced were *potentially* relevant to the scope of the discovery for which good cause was shown and whether all such documents had been produced. "When a trial court concludes a defendant's *Pitchess* motion shows good cause for discovery of relevant evidence contained in a law enforcement officer's personnel files, the custodian of the records is obligated to bring to the trial court all '*potentially relevant*' documents *to permit the trial court to examine them for itself.*" (*Mooc, supra*, 26 Cal.4th at pp. 1228-1229, italics added.) "Documents clearly irrelevant to a defendant's *Pitchess* request need not be presented to the trial court for in camera review. But if the custodian has any doubt whether a particular document is relevant, he or she should present it to the trial court." (*Mooc*, at p. 1229.) Instead of inquiring as to *potentially relevant* material, the trial court here asked for an opinion about whether the documents were *relevant*. Asking whether the documents are *relevant* is different from asking if they are *potentially relevant*, and, by only inquiring as to the former, the trial court abdicated its role as " 'the locus of decisionmaking' at the hearing." (*White, supra*, 191 Cal.App.4th at p. 1340, quoting *Mooc*, at p. 1229.) The trial court only viewed documents when it was affirmatively indicated that the document contained discoverable or relevant (as opposed to potentially relevant) information. (*Sisson v. Superior Court* (2013) 216 Cal.App.4th 24, 39 (*Sisson*) [trial court did not examine all potentially responsive documents the

70

custodians produced; rather, the trial court only examined a document if a custodian affirmatively indicated the document contained discoverable information].)

Additionally, "[t]he custodian should be prepared to state in chambers and for the record what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise nonresponsive to the defendant's *Pitchess* motion." (*Mooc, supra*, 26 Cal.4th at p. 1229.) Here, the trial court did not inquire about the agency records or categories of records the custodian opted *not* to produce, and the record reflects nothing about those records. (*People v. Guevara* (2007) 148 Cal.App.4th 62, 69 [if it is not readily apparent from the nature of the documents that they are nonresponsive or irrelevant to the discovery request, the custodian must explain his or her decision to withhold them; absent this information, the court cannot adequately assess the completeness of the custodian's review, nor can it establish the legitimacy of the custodian's decision to withhold documents, a procedure necessary to satisfy the trial court's role and obligations at a *Pitchess* hearing]; see *Sisson, supra*, 216 Cal.App.4th at p. 39 [same].)

Under the circumstances of the in camera hearing here, we would normally conditionally reverse and remand for the trial court to conduct a new in camera hearing using the proper procedures, including administration of the oath. However, we see no need to do so here because we conclude any error in discovery relative to other incidents is harmless here. "To obtain relief . . . a defendant who has established that the trial court erred in denying *Pitchess* discovery must also demonstrate a reasonable probability of a different outcome had the evidence been disclosed." (*People v. Gaines* (2009) 46 Cal.4th 172, 182-183 (*Gaines*).) The reasonable probability standard courts apply in *Pitchess* matters is the same standard courts apply to claims that the prosecution improperly withheld exculpatory evidence in violation of a defendant's right to due process under *Brady, supra*, 373 U.S. 83. (*Gaines*, at p. 183.)

Defendant sought *Pitchess* discovery related to Dunn, who was the handler of the canine that bit defendant. As it turned out, Dunn's testimony regarding the circumstances of the arrest was unimportant and added nothing to the overwhelming evidence amassed against defendant by other officers involved in the investigation. We are confident in concluding that, under the circumstances, any excessive force employed by Dunn in the past would not have been relevant and admissible here; but even if it was relevant and admissible, there is no reasonable probability it would have produced a different outcome (*Gaines*, *supra*, 46 Cal.4th at pp. 182-183) given the limited role Dunn played in the case.

As for Harris and Fry, the relevant contact they had with defendant was video recorded. They first met defendant in the interview room where the recording took place. Otherwise, there is no indication that they interacted with defendant off-camera except for the process of fingerprinting and photographing him. Defendant did not testify — either in the Evidence Code section 402 hearing concerning the voluntariness of his statements, or at trial — that the detectives did anything to him outside of the interview room that was coercive or otherwise caused him to be in fear of them. Whether the detectives had engaged in a pattern of coercive interrogation practices in the past with other people would not have been relevant to defendant's interrogation and admissible at trial, because defendant's interrogation was recorded and, as can be seen, devoid of any improper coercion. We conclude, under these circumstances, there is no reasonable probability defendant would have obtained a different outcome had discoverable information such as he requested regarding Harris and Fry been disclosed. (*Gaines*, *supra*, 46 Cal.4th at pp. 182-183)

## VI. Senate Bill 620

In addition to finding defendant guilty of murder in the first degree (§§ 187, 189), the jury found true the enhancement allegation that, in committing murder, defendant personally discharged a firearm causing the victim's death. (§ 12022.53, subd. (d).)

72

While his case was pending on appeal, the Governor signed Senate Bill No. 620 (2017-2018 Reg. Sess.) (Senate Bill 620), effective January 1, 2018.  Following the enactment of Senate Bill 620, the firearm enhancement in section 12022.53 now includes language stating in pertinent part:  "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section."  (§ 12022.53, subd. (h).)  Prior to the enactment of Senate Bill 620, and when defendant was sentenced, the trial court did not have discretion to strike or dismiss these enhancements.  The former language of section 12022.53 explicitly provided that the courts "shall not strike" enhancement allegations under that section.  (§ 12022.53, former subd. (h).)

We granted defendant's request for supplemental briefing on the impact of Senate Bill 620.  The People concede that the amendment to section 12022.53 should be afforded retroactive application to nonfinal judgments and that it should apply to this case.  However, the People further assert that, because it is clear that the trial court would not have exercised its discretion to strike the section 12022.53, subdivision (d), firearm enhancement, remand would be futile.  In making this argument, the People rely on the nature of defendant's crimes and the fact that the trial court imposed the upper term on count 2, although execution of that sentence had to be stayed pursuant to section 654.  Defendant replies that the trial court offered no indication as to whether it would strike the firearm enhancement if it had the discretion to do so, and otherwise did not make any statements such as stating that the maximum possible sentence was appropriate.

Senate Bill 620 applies retroactively.  (*People v. Woods* (2018) 19 Cal.App.5th 1080, 1090-1091.)  Accordingly, we proceed to consider the People's futility argument.

Remand is required unless the record reveals a clear indication that the trial court would not have reduced the sentence even if at the time of sentencing it had the discretion to do so.  (*People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110; *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.)  The People are certainly correct that defendant's

crimes here were "violent and callous," "vicious and cold-blooded." But, this will often, if not always, be the case when section 12022.53, subdivision (d), enhancement allegations have been found true.

Based on the record before us, we cannot conclude that the trial court clearly indicated it would not have exercised its discretion to strike or dismiss the firearm enhancement if it had the discretion to do so, and that therefore remand would serve no purpose. Accordingly, we agree with defendant that the matter must be remanded for the trial court to consider whether to exercise its discretion to strike or dismiss the section 12022.53, subdivision (d), enhancement.

## VII. Senate Bill No. 136

While this appeal was pending, the Governor also signed Senate Bill No. 136 (2019-2020 Reg. Sess.) (Stats 2019, ch. 590, § 1) (Senate Bill 136), effective January 1, 2020. We granted defendant's request for supplemental briefing on the effect of Senate Bill 136 on his two one-year prior prison term enhancements.

At the time of defendant's sentencing, section 667.5, subdivision (b), required trial courts to impose a one-year sentence enhancement for each true finding on an allegation that the defendant had served a separate prior prison term unless the defendant had remained free of both felony convictions and prison or jail custody during a period of five years since the subject prior prison term. (§ 667.5, subd. (b).) Following the enactment of Senate Bill 136, only prior prison terms for sexually violent offenses, as defined in Welfare and Institutions Code section 6600, subdivision (b), are subject to the one-year enhancement pursuant to section 667.5, subdivision (b). (Stats 2019, ch. 590, § 1.)

"By eliminating section 667.5, subdivision (b) enhancements for all prior prison terms except those for sexually violent offenses, the Legislature clearly expressed its intent in Senate Bill No. 136 . . . to reduce or mitigate the punishment for prior prison terms for offenses other than sexually violent offenses. [Citation.] Therefore, we conclude, and the parties agree, that under [the rule in *In re Estrada* (1965) 63 Cal.2d 740

74

(*Estrada*)[25]], Senate Bill No. 136's . . . amendment to section 667.5, subdivision (b) applies retroactively to all cases not yet final as of its January 1, 2020, effective date." (*People v. Jennings* (2019) 42 Cal.App.5th 664, 682.)

Because defendant's case was not final as of January 1, 2020, he is entitled to the ameliorative benefit of Senate Bill 136's amendment to section 667.5, subdivision (b). Neither of defendant's two prior prison terms were for "a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code." (Stats 2019, ch. 590, § 1.) Because these prior prison terms are no longer qualifying prior prison terms for the imposition of enhancements pursuant to section 667.5, subdivision (b), as amended by Senate Bill 136, we shall strike the two one-year prior prison term enhancements imposed.

## DISPOSITION

We modify the judgment to strike the two one-year prior prison term enhancements imposed pursuant to section 667.5, subdivision (b). We order remand to allow the trial court to consider whether to exercise its discretion to strike or dismiss the section 12022.53, subdivision (d), enhancement. The trial court shall prepare an amended abstract of judgment deleting reference to the section 667.5, subdivision (b), prior prison term enhancements. If, in the exercise of discretion, the trial court strikes or

---

**25** ' "[A]n amendatory statute lessening punishment is presumed to apply in all cases not yet reduced to final judgment as of the amendatory statute's effective date' [citations], unless the enacting body "clearly signals its intent to make the amendment prospective, by the inclusion of either an express saving clause or its equivalent" [citations]. This rule rests on an inference that when the Legislature has reduced the punishment for an offense, it has determined the "former penalty was too severe" [citation] and therefore "must have intended that the new statute imposing the new lighter penalty… should apply to every case to which it constitutionally could apply." ' " (*People v. Martinez* (2019) 31 Cal.App.5th 719, 724-725, citing *People v. DeHoyos* (2018) 4 Cal.5th 594, 600, *People v. Floyd* (2003) 31 Cal.4th 179, 184, *People v. Nasalga* (1996) 12 Cal.4th 784, 793, & *Estrada*, at pp. 744, 745, 747.)

dismisses the section 12022.53, subdivision (d), firearm enhancement, the court shall omit reference to that on the amended abstract as well.  The court is directed to forward a certified copy of the abstract to the Department of Corrections and Rehabilitation.  We otherwise affirm.


            /s/
      MURRAY, J.



We concur:



      /s/
RAYE, P. J.



      /s/
RENNER, J.

76